## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BARRY FARM TENANTS AND ALLIES ASSOCIATION, INC.,**
1419 V Street, NW
Washington, DC 20009

**DISTRICT OF COLUMBIA GRASSROOTS EMPOWERMENT PROJECT, INC. (d/b/a EMPOWER DC),**
1419 V Street, NW
Washington, DC 20009

and

**ISMAEL VAZQUEZ, SR.,**
1100 Stevens Road, SE
Washington, DC 20020

*Individually and on behalf of himself and all others similarly situated,*

**JACQUELINE THRASH,**
4 Anacostia Road, SE
Washington, DC 20019

*Individually and on behalf of herself and all others similarly situated,*

**BRENDA LUCAS**
1204 Eaton Road, SE
Washington, DC 20020

*Individually and on behalf of herself and all others similarly situated,*

   *Plaintiffs,*

   v.

**DISTRICT OF COLUMBIA HOUSING AUTHORITY,**
1133 North Capital Street, NE
Washington, DC 20002

Civil Action No. 17-cv-1762

**JURY TRIAL DEMANDED**

1

**PRESERVATION OF AFFORDABLE HOUSING, INC.,**
40 Court Street, Suite 700
Boston, MA 02108

and

**A&R DEVELOPMENT CORPORATION**
1040 Park Avenue, Suite 140
Baltimore, MD 21201

*Defendants.*

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Resident families of Barry Farm, a public housing property in an historic African-American community, stand to lose their housing because of their family status. These families are at risk of displacement because the number of two-, three-, four-, and six-bedroom units that accommodate them will be significantly reduced as part of the planned redevelopment of Barry Farm. In addition to facing the risk of displacement, many current and former resident families of Barry Farm have been forced to reside in deplorable conditions or to move off the property— all in furtherance of the planned redevelopment. At the same time, comparable public housing properties received maintenance at a level superior to that of Barry Farm, evidenced by the shorter number of days it took to complete repairs at the comparator properties, suggesting that Barry Farm residents are receiving disparate maintenance because of their place of residence—a property targeted for redevelopment.

Families who are forced to leave the community they have called home and find replacement housing, will face an uphill battle whether competing for the few vacancies at other public housing properties that offer comparably sized units or searching for such units in the District's private housing market through a Housing Choice Voucher. This redevelopment plan

4850-4035-5150.2

violates federal and District of Columbia fair housing laws that protect tenants from discrimination based on their "familial status" and "place of residence."  For these reasons, named plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, joined by the Barry Farm Tenants and Allies Association and Empower DC, bring this action under federal and state fair housing laws to challenge the discriminatory redevelopment of Barry Farm, ensure residents reside in safe and habitable housing, and secure an inclusive redevelopment of their community.

## I. PRELIMINARY STATEMENT

1. This is a lawsuit based on the constructive demolition of public housing and willful and deliberate discrimination by the Defendants in violation of federal law and the laws and regulations of the District of Columbia in connection with the redevelopment of Barry Farm, a public housing community owned and managed by the District of Columbia Housing Authority ("DCHA").

2. Defendants in this case have failed to comply with federal law, specifically the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "FHA") and the United States Housing Act, 42 U.S.C. § 1437p. In addition, Defendants have failed to comply with the laws of the District of Columbia, specifically the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.* (the "DCHRA").

3. Through their policies and practices in connection with the redevelopment of Barry Farm, Defendants have discriminated against families with children who reside in two-, three-, four-, and six-bedroom units at Barry Farm, by failing to ensure that two-, three-, four-, and six-bedroom units will be made available to families with children during and after the redevelopment to the same extent as they were before the redevelopment.

4850-4035-5150.2

4.   Families who are displaced by the redevelopment will likely experience great difficulties finding replacement housing.  A 2015 study from the Urban Institute indicates that the larger-sized rental units these families need are extremely limited in number and largely restricted to Wards 7 and 8, *see* Peter Tatian et al., Urban Institute, *Affordable Housing Needs Assessment for the District of Columbia, Phase II* (May 2015), assuming families are able to stay within District lines.  For those families who are unable to find housing in D.C., the redevelopment will force these families to move outside of the District or bring these families closer to homelessness.

5.   Additionally, as motivated in various ways by the pending redevelopment and otherwise, the DCHA has systemically and intentionally failed to maintain the Barry Farm property, causing occupied units within it to fall into a gross state of disrepair. After allowing the units to become uninhabitable DCHA pressured tenants to move out of their units to other public housing properties, keeping the units those tenants left vacant. In so doing, DCHA has discriminated against a group of Barry Farm tenants who have been forced to live in uninhabitable conditions as a result of their place of residence—i.e., because they reside at Barry Farm, a soon-to-be redeveloped property.  DCHA's systemic failure to maintain Barry Farm additionally allowed the property to be constructively demolished before the United States Department of Housing and Urban Development ("HUD") approved of DCHA's plans to dispose of these public housing units.

6.   Many of the members of both groups of tenants are members of the Barry Farm Tenants and Allies Association, Inc. ("BFTAA"), which is an associational Plaintiff in this suit seeking vindication of the rights of such members, as well as the Barry Farm community as a whole. In addition, the unlawful discriminatory acts of Defendants have required community-based

4

organization and organizational plaintiff, the District of Columbia Grassroots Empowerment Project (d/b/a "Empower DC"), to engage in activities to identify and combat Defendants' discriminatory conduct, thus requiring Empower DC to divert its scarce organizational resources from its core programming and frustrating its mission to improve the lives of low- and moderate-income District of Columbia residents.

7.  Plaintiffs seek declaratory and injunctive relief and damages on their own behalf and, as applicable, on behalf of two subclasses of current and/or former tenants of Barry Farm—(a) families with children and (b) tenants who have lived or continue to live under conditions of gross disrepair—for the harms they have suffered and continue to suffer as a result of the Defendants' discriminatory conduct.

## II. JURISDICTION

8.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs assert claims under a federal civil rights statute, the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* and the United States Housing Act, 42 U.S.C. § 1437p.

9.  This court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' District of Columbia law claims, which are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

10. This Court has personal jurisdiction over out-of-state Defendants pursuant to D.C. Code § 13-423(a), subsections 1-3 and 5.

11. Declaratory and injunctive relief is sought, as authorized by 28 U.S.C. §§ 2201-02.

## III. VENUE

12. Venue is proper in this District, under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to claims herein occurred within this District.

4850-4035-5150.2

## IV. PARTIES

### A. Plaintiffs

13. Plaintiff BFTAA is a non-profit corporation organized and existing under the laws of the District of Columbia.  The BFTAA was organized by Barry Farm residents to address issues of mutual concern related to the redevelopment of Barry Farm.  The BFTAA's business address is 1419 V ST NW, Washington, DC 20009.

14. Plaintiff Empower DC is a community-based non-profit corporation organized and existing under the laws of the District of Columbia.  Empower DC's principal place of business is at 1419 V ST NW, Washington, DC 20009.  Empower DC seeks to improve the lives of low- and moderate-income D.C. residents.  It accomplishes these ends through grassroots organizing, leadership development, and community education.  As part of its broader mission, Empower DC's Public Housing campaign supports long-time District of Columbia public housing residents by advocating to save and improve public housing in the District.

15. Plaintiff Ismael Vasquez, Sr. is an individual residing within Barry Farm at 1100 Stevens Road, SE, with his wife and their six minor children. Mr. Vasquez lives in a four-bedroom unit.

16. Plaintiff Jacqueline Thrash is an individual who formerly resided within Barry Farm at 1209 Sumner Road, SE, with her two adult daughters and three minor grandchildren. Ms. Thrash lived in a four-bedroom unit.  She currently resides at 4 Anacostia Road, SE, the property to which DCHA moved Ms. Thrash and her family.

17. Plaintiff Brenda Lucas is an individual residing within Barry Farm at 1204 Eaton Road, SE, with her three adult children and three minor grandchildren. Ms. Lucas lives in a three-bedroom unit.

4850-4035-5150.2

18. Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas bring this Complaint on their own behalf and on behalf of a class of persons similarly situated, pursuant to Fed. R. Civ. P. 23.  This suit is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

19. Plaintiffs Ismael Vasquez, Sr., Jacqueline Thrash, and Brenda Lucas represent families with children at Barry Farm who currently reside or formerly resided in two-, three-, four-, and six-bedroom units and are likely to be displaced by Defendants' proposed redevelopment ("Families with Children"), discussed in further detail below.

20. Plaintiffs Ismael Vasquez, Sr., Jacqueline Thrash, and Brenda Lucas additionally represent tenants of Barry Farm who currently reside or formerly resided in units having conditions of gross disrepair, discussed in further detail below.

   **B. Defendants**

21. The District of Columbia Housing Authority ("DCHA") is an agency of the District of Columbia government that owns and manages public housing units in the District of Columbia with its principal place of business at 1133 North Capital Street, NE, Washington, DC 20002.  At all times relevant to this lawsuit, DCHA has owned and managed Barry Farm.

22. Preservation of Affordable Housing, Inc. ("POAH") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 40 Court Street, Suite 700, Boston, MA 02108.  POAH is registered and authorized to do business in the District of Columbia, and is, in fact, regularly doing business in the District of Columbia in connection with the redevelopment of Barry Farm and otherwise.

23. A&R Development Corporation ("A&R") is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 1040 Park Avenue, Suite 300, Baltimore, Maryland 21201.   A&R is regularly doing business in the District of Columbia in connection with the redevelopment of Barry Farm and, upon information and belief, otherwise.

## V. FACTUAL ALLEGATIONS

### A. **The Barry Farm Public Housing Community**

24. Barry Farm is a public housing community, organized as a complex of row houses, situated east of the Anacostia River in Ward 8 of Southeast Washington, DC. The area is bounded by two arterial highway—Suitland Parkway on the east and Interstate 295 on the north.   To the east of Barry Farm, across Suitland Parkway, is the Anacostia Metro Station and to the west is the St. Elizabeth's West campus.

25. Barry Farm is part of the rich history of the District of Columbia.   In 1867, the U.S. Bureau of Refugees, Freedmen, and Abandoned Lands established the area as a post-Civil War community for formerly enslaved persons.   The Bureau purchased 375 acres of land from David Barry, planning to provide lots for housing for African Americans and use the proceeds to simultaneously fund public education.   The acreage was subdivided into approximately one-acre lots and sold on installment plans or leased. Barry Farm was the first community in the District of Columbia for African-American homeowners.   By 1890, the original settlement had become one of the most vibrant black communities in the city. The sons of famed abolitionist Frederick Douglass even called Barry Farm home.[1]   Today,

---

[1] Courtland Milloy, *D.C.'s plan to rebuild Barry Farm falls far short of the tribute we owe its founders*, WASH. POST, Nov. 4, 2014, https://www.washingtonpost.com/local/dcs-plan-to-rebuild-barry-farm-falls-far-short-

many of the streets in the neighborhood recognize prominent advocates of African-American issues during the Civil War era.

26. During World War II, the U.S. Government constructed public housing on the eastern edge of the community to ease overcrowding across the Anacostia River.  By 1954, the Redevelopment Land Authority began replacing that housing with the row house dwellings that currently comprise Barry Farm.  However, in the years following that redevelopment, lack of maintenance attention from government officials ultimately led to the deterioration of Barry Farm's physical housing stock.

27. Barry Farm has historically been and continues to be a primarily African American public housing community which is home to many families with children.  Current DCHA records show that 30 percent of the property is comprised of children—the single largest demographic as compared to seniors and single adults.[2]

**B. The New Communities Initiative**

28. The New Communities Initiative ("NCI") is a D.C. government program "designed to revitalize severely distressed subsidized housing and redevelop communities plagued with concentrated poverty, high crime, and economic segregation."[3]  NCI began in 2005 as a

---

of-a-tribute/2014/11/04/ae0ad2c4-644c-11e4-836c-83bc4f26eb67_story.html?utm_term=.f2315ea89f9e (last visited Aug. 28, 2017).

[2] Further, the demographics of Barry Farm also appear to confirm the prevailing historical data on the overall demographics of public housing.  Data shows that the larger the project, the more likely the project and the tract were to be predominantly African American.  And because family developments have historically been predominantly African American (in family developments, 20 percent of heads of households were white, 64 percent African American, 13 percent Hispanic, and 2 percent Asian) while elderly developments were largely white, Barry Farm, by extension was and is likely to be comprised more heavily of families with children than non-family households.  John Goering, Ali Kamely, Todd Richardson, Office of Policy Development and Research, U.S. Department of Housing and Urban Development, *An Analysis of the Racial Occupancy and Location of Public Housing Developments*, 2-3, 20-21 (1994).

[3] http://dcnewcommunities.org/about-nci/ (last visited Aug. 28, 2017)

9

local response to budget cuts to federal housing revitalization programs.   The initiative targets four neighborhoods in the District of Columbia, including Barry Farm in Ward 8.[4]

29. D.C.'s Office of the Deputy Mayor for Planning and Economic Development ("DMPED"), in partnership with the DCHA, manages the initiative.

30. NCI seeks to create "vibrant mixed-income neighborhoods that address both the physical architecture and human capital needs, where residents have quality affordable housing options, economic opportunities and access to appropriate human services."  In pursuing this goal, NCI has stated that it operates under four guiding principles:

> 1.    **One for One Replacement** to ensure that there is no net loss of affordable housing units in the neighborhood.
>
> 2.    **The Opportunity for Residents to Return/Stay in the Community** to ensure that current residents will have a priority for new replacement units in an effort to remain in their neighborhood.
>
> 3.    **Mixed-Income Housing** to end the concentration of low-income housing and poverty.
>
> 4.    **Build First**, which calls for the development of new housing to begin prior to the demolition of existing distressed housing to minimize displacement.[5]

31. Based on these principles, the D.C. Council created redevelopment plans for the four targeted District neighborhoods. The redevelopment plans call for physical redevelopment through replacement with mixed-income housing, as well as investment in human capital through supportive services designed to help households achieve self-sufficiency.   The physical component of the plan calls for demolition of more than 1,500 distressed housing units spread across the four neighborhoods.   Further, to date DCHA and DMPED have

---

[4] *Id.* The other three neighborhoods are: Lincoln Heights/Richardson Dwellings in Ward 7, Northwest One in Ward 6, and Park Morton in Ward 1.

[5] *Id.*

4850-4035-5150.2

failed to determine how they will obtain a significant amount of the necessary funding for NCI, which calls into serious doubt whether the initiative will come to fruition, as planned.

**C. The D.C. Council's Plan for Barry Farm**

32. On July 25 2006, the D.C. Council approved the Barry Farm Redevelopment Plan ("Plan").[6] According to the District of Columbia, the goal of the redevelopment of Barry Farm "is to transform the public housing development into a mixed-income, mixed-use community."[7] The planned Barry Farm redevelopment would consist of approximately 1,100 units.[8] The Plan affects 444 existing public housing rental units, including 432 units at the existing Barry Farm property (an additional 12 existing rental units at the adjacent Wade Apartments property are also included in the Plan).

33. Pursuant to the Plan, on July 31, 2013, the board of the D.C. Housing Authority selected Preservation of Affordable Housing ("POAH") and A&R Development to act as a private sector development team for Barry Farm.[9] POAH is a non-profit developer that focuses on housing for low- and moderate-income residents and has previously developed the Garfield Hill Apartments in the District. A&R is a Baltimore-based private developer that has served as a partner on several D.C. projects.

---

[6] http://lims.dccouncil.us/Download/35269/PR21-0553-Introduction.pdf (last visited Aug. 28, 2017).

[7] http://dcnewcommunities.org/barry-farm-development/ (last visited Aug. 28, 2017). The plans submitted by Defendants to the Zoning Commission, which were subsequently approved, call for a higher number of units in the redevelopment. *See infra* at paragraph 38 and note 13.

[8] Because figures in the Barry Farm Redevelopment Plan conflict with figures in Defendants' Zoning Commission submissions and in the order of the Commission approving the First-Stage PUD for redevelopment of Barry Farm, this complaint will refer only to the figures provided in the Zoning Commission record going forward.

[9] Jonathan O'Connell, *Developers selected to redevelop Barry Farm public housing complex*, WASH. POST, July 31, 2013, https://www.washingtonpost.com/blogs/capital-business/post/developers-selected-to-redevelop-barry-farm-public-housing-complex/2013/07/31/4f882050-fa15-11e2-8752-b41d7ed1f685_blog.html?utm_term=.cf00ef639422 (last visited Aug. 28, 2017).

**D. The Barry Farm Redevelopment and Defendants' Zoning Commission Disclosures**

34. On February 20, 2014, Defendants DCHA, POAH and A&R filed a first-stage Planned Unit Development application (the "First-Stage PUD") with the D.C. Zoning Commission. Defendants together designated themselves collectively as the "applicant" for the First-Stage PUD.

35. The First-Stage PUD is the operative document that sets forth the parameters for the redevelopment of Barry Farm.

36. The redevelopment plan seeks a mixed-use development of a PUD site that consists of: (1) Barry Farm residences; (2) Wade Apartments,[10] and (3) eight vacant properties that are owned by the District.[11]

37. The mix of existing units at Barry Farm and other properties included in the redevelopment plan as reported by the applicant in July 2014 are as follows:

| BEDROOM SIZE | NUMBER OF UNITS |
|---|---|
| 1 Bedroom | 3 |
| 2 Bedrooms | 213 |
| 3 Bedrooms | 179 |
| 4 Bedrooms | 39 |
| 6 Bedrooms | 10 |

---

[10] Wade Apartments is comprised of 12 low-income units at the corner of Wade and Eaton Roads and also managed by the DCHA. Zoning Commission Order No. 14-02, Case No. 14-02 (May 29, 2015), Doc. 107, at ¶¶ 145-147 [hereinafter "Z.C. Order"], https://app.dcoz.dc.gov/Content/Search/Search.aspx (last visited Aug. 28, 2017).

[11] Z.C. Order at ¶¶ 1-2.

4850-4035-5150.2

| TOTAL | 444[12] |
|-------|---------|

38. Defendants' proposed redevelopment plan will include 1,400 residential units (of various types) to be built on the existing site of which only 344 will be replacement public housing units.   Because the redevelopment plan calls for "one-to-one" replacement of public housing, Defendants intend to permanently re-locate some 100 tenants in public housing away from the redeveloped property.[13]

39. Because Barry Farm is part of the District's NCI, which has as one of its primary goals to "'build first,' by constructing units off-site and in the community of the affected property to provide housing for residents in their base community during redevelopment, . . . 60 replacement units have already been constructed for Barry Farm families in Matthews Memorial Terrace, located at 2632 Martin Luther King Jr. Avenue, SE., and Sheridan Station Phase I, located at 2516 Sheridan Road, SE.  Sheridan Station Phase III is currently under construction and will deliver 40 additional replacement public housing units for Barry Farm families."[14]

40. Defendants claim that "[t]he bedroom count for the 344 Barry Farm/Wade Apartments replacement public housing units to be constructed on the PUD Site will be determined by the bedroom needs of the returning households."  Based on data that the DCHA alleges to have collected "regarding the needs of current Barry Farm/Wade Apartments residents and the needs of the families on DCHA's waiting list for public housing," which reflected 380

---

[12] *See* Ex. A, Cover Letter from Applicant Enclosing Post-hearing Materials (July 14, 2014), Case No. 14-02, Doc. 69 at 4 [hereinafter "July 2014 Cover Letter"].

[13] Z.C. Order at ¶¶ 137, 146, 147.

[14] Z.C. Order at ¶ 59.

remaining households as of June 2014, Defendants proposed building the following unit mix:[15]

| BEDROOM SIZE | NUMBER OF ORIGINAL UNITS | NUMBER OF PROPOSED UNITS | LOSS/GAIN OF UNITS |
|---|---|---|---|
| 1 Bedroom | 3 | 102 | +99 |
| 2 Bedrooms | **213** | **135** | **-78** |
| 3 Bedrooms | **179** | **102** | **-77** |
| 4 Bedrooms | **39** | 33 | **-6** |
| 5 Bedrooms | **0** | 6 | +6 |
| 6 Bedrooms | **10** | 2 | **-8** |
| **TOTAL** | 444 (units) | 380 | **Loss of 163 2-, 3-, 4-, and 6-bedroom units** |

41. Defendants' proposal accounts for 380 households (comprised of 1,069 residents, including 544 children) which, upon information and belief, does not account for the housing needs of all of the residents who live or previously resided in the original 444 public housing units at Barry Farm and Wade Apartments.  This is the case whether one looks back to the number of residents as of October 1, 2012, the effective date of residency upon which Defendant DCHA promised residents the right to return to the redeveloped Barry Farm under the NCI, or February 20, 2014, the date Defendants filed their First-Stage PUD.

42. Although Defendant DCHA committed to honor Barry Farm residents' right to return under the NCI framework, Defendants do not explain whether the number of proposed units for each unit type also accounts for the needs of households who have already moved off of the property and wish to return.  Accordingly there is no data that shows the demographics of such relocated tenants, which would further inform and more accurately reflect Defendants' households housing needs assessment.

---

[15] Ex. A, July 2014 Cover Letter at 5(describing occupancy and demographic data as of June 26, 2014). Defendant DCHA failed to produce current demographic data pursuant to two Freedom of Information Act requests submitted in March 2015.

43. Further, Defendants refer to the DCHA's public housing waiting list in justifying their needs assessment, claiming that it is a relevant basis from which to further determine Barry Farm residents' housing needs and the ultimate proposed unit mix for the Barry Farm redevelopment.  Defendants do not explain what percentage of tenants of its public housing waiting list is comprised of Barry Farm residents in order to assess whether the proportionate share of Barry Farm-specific waiting list applicants reflects the same or roughly comparable housing needs as that of the entire public housing waiting list. Defendants fail to explain how the needs of individuals reflected in the public housing waiting list are the correct measure from which to draw up a needs assessment of eligible Barry Farm residents who wish to return to the redeveloped Barry Farm property and a corresponding proposed unit mix for the proposed Barry Farm redevelopment.

44. Further, Defendants provide no demographic information that shows the household sizes, composition, ages, and gender of household members who reside or have resided at Barry Farm which would support Defendants' claims that the needs of the households on the public housing waiting list (83% of whom seek studios, one- and two-bedroom units, 13% of whom seek three-bedroom units, and 4% of whom seek four-bedroom units or larger) are an accurate and representative sample of the unit size needs of Barry Farm tenants who seek housing in the Barry Farm redevelopment.

45. Defendants' Zoning Commission disclosures additionally do not clarify what unit size housing is offered at Matthews Memorial Terrace, Sheridan Station I, or Sheridan Station III, which currently provide or will offer the remaining 100 replacement public housing

4850-4035-5150.2

units.  Public records suggest that neither property offers apartments of more than three bedrooms.[16]

46. A few months after Defendants filed their redevelopment plan, Defendants reported that 380 households continued to reside at Barry Farm.  As of the filing of this complaint, only 195 units remain occupied at Barry Farm.[17]  As of August 2016, the numbers were similar—201 units were occupied while 225 remained vacant.[18]  With such high levels of attrition and a continuing moving target from which to assess residents' housing needs, Defendants may later claim that the appropriate number from which to determine the unit mix of the redevelopment is that which reflects the needs of remaining households, thus likely allowing for the total number of units to continue decreasing and the unit mix to continue shifting.

47. As part of its order approving the First-Stage PUD, the Zoning Commission found "that the Applicant [Defendants] provided sufficient details regarding the intended income mix, size, and typology of the proposed residential units on the PUD site."  Further, the Commission found that the proposed units "w[ould] be of an appropriate size to accommodate the needs of all returning residents."  In so finding, the Commission added that "the proposed units will be of an appropriate size to accommodate the needs of all returning residents" even though "the exact determination of income and tenure mix" would be subject to various

---

[16] *See* Matthews Memorial Terrace website, http://www.matthewsmemorialterrace.com/ floorplans.aspx (last visited Aug. 28, 2017); Sheridan Station website, http://www.sheridanstation.com/ Marketing/FloorPlans (last viisted Aug. 28, 2017).

[17] *See* D.C. Housing Authority website, Barry Farm page, http://dchousing.org/ property.aspx?id=5I (last visited Aug. 28, 2017).

[18] According to information produced by Defendant DCHA pursuant to a District of Columbia Freedom of Information Request, as of August 2016, only 201 units remained occupied, of which 199 were two-, three-, four-, and six- bedroom units.

16

factors, including "market demand,"[19] making clear that Defendants can continue to change the unit mix they propose for the redevelopment.

48. The Zoning Commission approved Applicant's First-Stage PUD on October 20, 2014 and adopted its decision on December 8, 2014.  The decision to approve Defendants' First-Stage PUD "bec[a]me final and effective upon publication . . . on May 29, 2015."[20]  Plaintiff BFTAA appealed the decision to the District of Columbia Court of Appeals ("DCCA") (Case No. 15-AA-1000) within the statutory period, and a decision on the merits is pending.

49. On April 24, 2017, Defendants filed a request for a two-year extension to file their second-stage PUD application for four parcels of land that comprise part of the Barry Farm redevelopment by May 29, 2019, due to the pending litigation before the DCCA that has yet to be resolved.  Pursuant to the Zoning Commission's order approving the First-Stage PUD, Defendants' second-stage PUD application should have been filed within two years of the effective date of the order (May 29, 2015), i.e., May 29, 2017.  The Zoning Commission approved the extension on August 15, 2017, which will further delay implementation of the redevelopment.

### E. DCHA's Systemic Failure to Maintain

50.  After submitting its First-Stage PUD to the Zoning Commission in 2014, and increasingly so after the Commission issued its order approving the First-Stage PUD, DCHA has

---

[19] ZC Order No. 14-02, Z.C. Case No. 14-02 (May 29, 2015) at ¶¶ 145-147.

[20] ZC Order No. 14-02, Z.C. Case No. 14-02 (May 29, 2015) at 64-65. Note: the Commission also found in its Findings of Fact that Applicant's request for additional time to complete its second stage-PUD was "necessary to allow the Applicant to proceed through the HUD funding and disposition processes; initiate predevelopment activities, and further engage with the community and existing residents," but it required the Applicant to meet certain benchmarks within the approved ten year period by filing various second-stage applications.

The Applicant is required to file its second-stage application for the final phase of the redevelopment no more than 10 years after the effective date of the current order (May 29, 2025). *Id.* at ¶¶ 69, 144, and at 64 ¶ E.1.

17

systematically failed to maintain Barry Farm units in an attempt to clear the property for redevelopment.  Anecdotal evidence suggests that once conditions in a particular unit deteriorated to the point that the unit was uninhabitable, DCHA often pressured tenants to move, without assurances that they would have an enforceable right to return rather than repair the unit.  In the event where residents moved out of their units, DCHA additionally adopted a practice of keeping such units vacant. Such practices allowed a significant number of units at Barry Farm to remain vacant months before HUD approved the demolition of those units.

51. Under District of Columbia law, landlords are required to provide apartments to tenants that are in a safe, habitable and livable condition.  Relatedly, the landlord has a duty to make all repairs necessary to make buildings and apartments habitable.  Local law also requires landlords to maintain buildings and apartments according to the District of Columbia Housing Code Standards.[21]  The Housing Code Standards in turn guarantee minimum safety and habitability standards covering issues ranging from adequate heating to working kitchen facilities and rodent-free homes.[22]

52. Similarly, a federal counterpart regulation issued by HUD sets forth the minimum physical condition standards for federally-assisted housing, including public housing properties such as Barry Farm.  The regulation dictates that such housing must be kept in decent, safe, sanitary, and habitable conditions.[23]

---

[21] *See DC Housing Code Standards, Department of Consumer and Regulatory Affairs, https://dcra.dc.gov/service/dc-housing-code-standards (last visited Aug. 28, 2017);.see generally* Title14 of District of Columbia Municipal Code, Chapters 4-8.

[22] *See, e.g.,* D.C. Municipal Code §§ 14-704.2 (requiring walls that don't allow entry of rodents), 14-705.7 (requiring windows and doors that don't allow entry of rodents), 14-804 (requiring rat-proofing by owner/licensee required), 14-501 (setting standards for heating), and 14-506 (setting standards for ventilation of kitchen).

[23] 24 C.F.R. § 5.703.

53. Pursuant to a March 2016 District of Columbia Freedom of Information Act submitted by Plaintiffs' Counsel, *see* D.C. Code §§ 2-531-539, to the DCHA ("March 14, 2016 Request"), Plaintiffs' counsel specifically sought records, documents, and electronic files regarding, among other items, the status of maintenance requests for Barry Farm and a number of other DCHA-managed public housing properties from 2012 through March 2016.[24] On September 27, 2016, Plaintiffs' counsel further streamlined the request to facilitate Defendant DCHA's ability to produce the information, seeking only maintenance records for the James Creek, Kelly Miller, Arthur Capper Senior, Lincoln Road, and Harvard Tower properties from January 2014 through the date of the request, i.e., September 27, 2016.

54. On December 14, 2016, DCHA produced maintenance records for Barry Farm and the James Creek, Kelly Miller, and Harvard Towers properties ("Comparator Properties") for the years 2014-2016.[25] The records reflect that during the relevant time period, DCHA provided differential maintenance services to Barry Farm residents by failing to timely repair Barry Farm tenants' "routine" requests as of 2015, the year in which the Zoning Commission approved Defendants' First-Stage PUD.

55. The records show that it took DCHA an additional number of days to complete "routine" repairs at Barry Farm as compared to those for the Comparator Properties. Whereas in 2014 the number of days from call-to-completion of "routine" Barry Farm repairs averaged nine

---

[24] The March 14, 2016 Request additionally sought documentation and correspondence "describing how redevelopments . . . of public housing properties factor into the manner in which the DCHA handles or has handled public housing maintenance requests" from 2012 through March 2016, including documentation specific to redevelopments of New Communities Initiative properties. Plaintiffs never received a responsive answer to this portion of the March 14, 2016 Request other than the proposed 2017 budgets for DCHA-managed properties.

[25] DCHA noted in its December 14, 2016 cover letter that it could not produce maintenance records for Arthur Capper Senior and Lincoln Road because it did not own the former and did not manage the latter.

(9), the number escalated to fifteen (15) in 2015 and then to seventeen (17) in 2016.  During the period in which Barry Farm "routine" repair call to completion times increased, the time between the reported call date to the date of completion *decreased* at the Comparator Properties.

56. At the Comparator Properties, it took DCHA ten (10) days from call to completion to repair "routine" maintenance requests in 2014.   In 2015, it took eight (8) days for DCHA to complete "routine" maintenance repairs at the Comparator Properties and nine (9) days in 2016.

57. As a result, although DCHA originally treated "routine" repairs similarly in 2014 at Barry Farm and the Comparator Properties, it subsequently systemically failed to timely complete such "routine" maintenance repairs for Barry Farm residents in 2015 and 2016.  In 2015, DCHA took seven more (7) days to complete routine repairs for Barry Farm residents as compared to repairs for residents at the Comparator Properties, and in 2016, it took DCHA eight (8) more days to complete Barry Farm "routine" repairs as compared to similar requests at the Comparator Properties.

58. As a result of this systemic maintenance neglect, units have fallen into a deep state of disrepair.  Residents report having holes in the floor and walls, leaking ceilings, faucets, and toilets, caved in ceilings, broken appliances, pealing or chipped paint, broken or missing doors, windows, and screens, and persistent rodent and insect infestations.   Further, residents claim they have made maintenance requests, but explain that DCHA is either non-responsive or that service is slow to come.  When DCHA does make repairs, they are often patchwork or temporary fixes that do not last.  Tenants whose units became unlivable due to maintenance neglect were not offered repairs, but encouraged to relocate immediately.

4850-4035-5150.2

59. Furthermore, Defendants failed to fix broken security doors in a timely fashion and allowed non-residents—strangers to the Barry Farm community—to hang out in common areas and move into vacant units.  Upon information and belief, those strangers have been allowed to use vacant units to store guns and drugs.  This has created an increasing sense of insecurity and peril for the remaining residents.

60. In the most egregious cases, tenants have reported that they were forced to live in unsafe and squalid conditions.  Barry Farm residents reported the following incidents, which in some cases required residents to move off the property in order to avoid living in uninhabitable conditions:

> i. Serious flood-related water damage that resulted in a hole into which a resident's child fell.  Relatedly, another resident reported holes in the ceiling that let in rain and resulted in decaying wood which lasted for six or seven months;

> ii. Repeated reports of broken heating systems affecting multiple families that went unrepaired in the winter months.  In one instance, the lack of heat prevented a tenant from bringing a newborn baby downstairs to the ground level on a regular basis, while another family went with heat for up to two years;

> iii. Persistent rat issues that have plagued multiple residents.  In one case, a tenant was required to discard her furniture and appliances because the rats chewed through most of these items.  The same resident also found rate feces in her toddler grandchild's crib;

> iv. Raw sewage leaks which spilled onto a resident's kitchen counter and floor two to three times a week;

     *v.*  Lifted tiles on the floor which left the resident having to walk on exposed gravel in her unit rather than flooring; and

     *vi.*  Severe and pervasive mold on the wall and in the closets which forced one family to move out because the mold continuously aggravated the resident's daughter's allergies.

61. By allowing such conditions to occur and/or persist, Defendant DCHA caused violations of the District of Columbia's Housing Code standards and/or 24 C.F.R. § 5.703, and/or otherwise violated the legal standard for maintaining habitability of rental housing ascribed to landlords under D.C. law.

62. As a result of the systemic maintenance failures, residents have repeatedly reported feelings of anxiety, stress, and immediate concern for the wellbeing of their families knowing that they were exposing their family members to harmful consequences, whether physical, mental or emotional, by continuing to live in such deplorable conditions. In some instances where the state of the unit became uninhabitable because DCHA failed to repair the most pervasive and harmful conditions, or to do so in a timely or effective manner, families found they had no choice but to move off the property.

63. In offering an explanation to the District of Columbia Council at a January 28, 2016 "Public Roundtable of the Committee [on Housing and Community Development] on the Issue of New Communities Initiative and the Right to Return," regarding whether Defendant DCHA's apparent decision to disinvest in Barry Farm maintenance because of the redevelopment,[26] then DCHA Director Adrianne Todman offered the following explanation:

---

[26] January 28, 2016, Councilmember Anita Bonds' "Public Roundtable of the Committee [on Housing and Community Development] on the Issue of New Communities Initiative and the Right to Return" at 5:45:26-5:47:08;

We need to move you . . . because for us to fix the unit would expend a large amount of money on that one unit that we are about to tear down *within the next five years*, if not less. So from a . . . standpoint of where is the best place to invest our federal dollars when it comes to that kind of heavy lift with a unit, we would rather invest it in a unit that will be around for some time than a unit that is poised to be demolished and there is an application [for demolition approval] headed into HUD.[27]

64. DCHA further explained that it decided some tenants should not continue to live in their units and moved these families.[28]   Despite Director Todman's testimony, Plaintiffs' evidence shows that Barry Farm tenants continued to experience outstanding and significant conditions issues in their units, conditions which have remained unaddressed.  This despite the fact that the DCHA and DMPED have not determined how the redevelopment will be funded and an excessively delayed timeline.  Defendants failed to maintain units after submitting the First-Stage PUD application in 2014, a pattern which became even more pervasive and egregious in 2015 and 2016 once the Zoning Commission approved the First-Stage PUD.  Upon information and belief, Defendant DCHA's systemic failure to maintain Barry Farm and the timing of its neglectful behavior indicate that it did so in order to clear out the property in preparation to demolish the units for the redevelopment before receiving the HUD approval.

65. On January 20, 2017, HUD issued its demolition disposition approval notice to Defendant DCHA for the demolition of Barry Farm and Wade Road.

---

5:47:13-5:47:46, http://dccouncil.us/videos/archive/ (search terms: "Right to Return"; scroll by date) (last visited Aug. 28, 2017).

[27] *Id.* at 5:48:19-5:48:58.

[28] *Id.* at 5:48:59-5:49:19.

4850-4035-5150.2

## VI. Individual Allegations

### A. Ismael Vazquez, Sr.

66. Ismael Vazquez, Sr. has resided in a four-bedroom unit at Barry Farm with his family since 2010.

67. Mr. Vazquez lives with his wife, Nicole Odom, and their six children; Taina, Ismael, Amina, Lina, Kalimah, and Safiyah Vazquez, ages 14, 13, 12, 10, and 1, respectively.

68. In 2017, Mr. Vazquez and his wife were contacted by DCHA and offered a unit at Highlands Dwellings Public Housing located at 520 Atlantic Street SE, nearly three miles southeast of Barry Farm. This is the only option Mr. Vazquez and his family have been given for relocation by Defendant DCHA.

69. Relocating to Highland Dwellings would cause Mr. Vazquez and his family significant harm because of increased commute times. Mr. Vazquez and his family rely on the metro to get to work as Mr. Vazquez works in Silver Spring, Maryland, and four of his children attend school in Northwest Washington, DC. The nearest metro station is a mile and a half away from Highland Dwellings compared to a quarter mile from Barry Farm. Traveling this additional mile and a half to the metro would increase commute times for each family member by approximately thirty minutes in each direction and increase the cost of family members' commutes.

70. Mr. Vazquez and his wife also worry about the safety of their children who have to travel to and from school by public transportation because of the added complication transferring from the bus to the train. In addition, teenage children from other parts of the city, like Highland Dwellings, often harbor animus towards teenagers from Barry Farm, and Mr. Vazquez worries his children will face violence and other forms of harassment if they have

to move to a new community.  From Mr. Vazquez's understanding, Highland Dwellings has a higher crime rate than Barry Farm.

71. Further, during the past seven years Mr. Vazquez and his family have worked hard to establish relationships with their neighbors and they depend on them for mutual support. Having to move to a new community would mean that they would lose those relationships on which they rely.

72. Because of the ages of his children and the size of his family, Mr. Vazquez requires at least a four-bedroom unit.

73. If Mr. Vazquez and his family are unable to return to the redeveloped Barry Farm property, the family will likely experience an extreme hardship trying to find an adequately sized home in D.C. with at least four bedrooms, including through other public housing and/or with a Housing Choice Voucher, because of the limited number of such large units.

74. In recent years Mr. Vazquez and his family have had to endure substandard living conditions because of maintenance neglect by DCHA.  Issues the family has had to contend with include a rat infestation so severe that they cannot keep food in the cabinets, cracks in the floor boards that gives rise to a draft that undermines their efforts to heat or cool the unit, ceilings that collapse because of leaks that went untreated, a lack of heat for two years, and mold.

75. Mr. Vazquez has informed DCHA of his unit's maintenance needs on numerous occasions. The maintenance staff is slow to act and when they do make repairs, the quality of the work is poor and of a temporary nature, which means the problems recur.  For example, because the extermination company employed by DCHA is unreliable and ineffective, Mr. Vazquez's family continues to experience rodent issues.

### B. Jacqueline Thrash

76. Jacqueline Thrash resided in a four-bedroom unit at Barry Farm with her two daughters and three grandchildren. Her daughters are Jalaya and Desire Thrash, ages 31 and 25, respectively. Her grandchildren are Marie Bryant, age 5, Ryliee Thrash, age 1, and Zalil Collins, who is 7 months old. The family had lived at Barry Farm since 2001.

77. Near the end of February 2017, rather than address numerous maintenance issues in her unit, Ms. Thrash was transferred from Barry Farm to a public housing unit at 4 Anacostia Road, SE.

78. Being forced to move from Barry Farm has caused Ms. Thrash's household considerable harm because of increased commute times. One of her granddaughters attends Excel Charter School, which is located at 2501 Martin Luther King Jr. Avenue, SE, a mere 5 minute walk from Barry Farm. Another granddaughter attends the National Children's Center Daycare, which is less than 10 minutes from Barry Farm. Now it takes over an hour for Ms. Thrash to drop her grandchildren off at their respective schools. Jalaya Thrash works at the National Zoo. When she lived at Barry Farm, Jalaya Thrash would commute by train in about an hour. Now she is forced to take three buses and her commute takes two and a half hours.

79. Furthermore, Ms. Thrash has been disconnected from her church. For twelve years before being moved from Barry Farm, she attended services on Sunday and taught bible classes on Wednesdays. The bus that would take her from her new apartment to the church does not run on Sunday and runs very infrequently in the evening. Therefore, Ms. Thrash has been completely cut off from her support networks at church.

80. Because of the size of Ms. Thrash's family, she requires a four-bedroom unit.

81. If Ms. Thrash and her family are unable to return to the redeveloped Barry Farm property, the family will likely experience an extreme hardship trying to find an adequately sized four-bedroom home in D.C., including through other public housing and/or with a Housing Choice Voucher, because of the limited number of such units.

82. During the last few years while living at Barry Farm, Ms. Thrash and her family had to endure substandard living conditions due to Defendant DCHA's maintenance neglect. Issues the family has had to contend with included a severe rodent infestation, holes in the floor, leaks in the ceiling, heat that does not work properly, and mold.

83. Ms. Thrash informed Defendant DCHA of her unit's maintenance needs on numerous occasions.  The maintenance staff was slow to act and any repairs DCHA did undertake were of poor quality and of a temporary nature.  For those reasons, the problems often recurred.  Like Mr. Vazquez and his family, Ms. Thrash found the extermination company employed by DCHA to be unreliable and ineffective. Moreover, DCHA additionally suggested Ms. Thrash need not worry about repairs because she was going to be moved off the property.

**C. Brenda Lucas**

84. Plaintiff Brenda Lucas resides in a three-bedroom unit at Barry Farm with her children and grandchildren.  Her children are Alanna Hill, age 43, Damian Aull, age 24, and Antionette Porter, age 14.  Her grandchildren are Jayla Hill, age 16, Autumn Hill, age 11, Symone Hill, age 10, and Amahi Dent who is 11 months old.  The family has lived at the property since 2009 and would like to stay at Barry Farm.

85. Having to relocate outside of the neighborhood would cause Ms. Lucas and her family significant harm because of increased commute times.  Autumn and Symone attend Excel

Public Charter School, which is located adjacent to Barry Farm.  Jayla and Antoinette attend Richard Wright Public Charter School which is easily accessible by bus from Barry Farm. Additionally, Ms. Lucas, who is 71 years old, takes the metro to her doctor, and would be substantially burdened if she were moved to housing that was not on a metro line because of her limited mobility issues. Moving outside of the neighborhood would complicate the commutes of her entire family.

86. Because of her family's size, Ms. Lucas lives in a three-bedroom unit.

87. If Ms. Lucas and her family are unable to return to the redeveloped Barry Farm property, the family will likely experience an extreme hardship trying to find an adequately sized three-bedroom home in D.C., including through other public housing and/or with a Housing Choice Voucher, because of the limited number of such units.

88. During the last few years Ms. Lucas and her family had to endure substandard living conditions of maintenance neglect by DCHA.  Issues the family has had to contend with include mold and lack of heat.

89.  Although Ms. Lucas has informed DCHA of her unit's maintenance needs on numerous occasions, she has found DCHA maintenance staff slow to act.  When DCHA does undertake repairs, the quality of the work is poor and of a temporary nature, which means the problems recur.

### D. Empower DC

90. Empower DC is a community-based organization which seeks to improve the lives of low- and moderate-income D.C. residents, including those of D.C. public housing residents, through grassroots organizing, leadership development, and community education.

91. As part of Empower DC's Public Housing campaign, which supports long-time District of Columbia public housing residents by advocating to save and improve public housing in the District, Empower DC began organizing Barry Farm residents around a set of tenant-driven demands intended to improve the conditions of Barry Farm tenants' housing and to prevent residents' displacement as a result of the planned redevelopment of Barry Farm.

92. Empower DC brings this action on its own behalf because Defendants' discriminatory conduct has damaged Empower DC by frustrating its mission of improving the lives of D.C. public housing residents.  Specifically, Defendants' redevelopment plan and actions taken in furtherance of their plan, as written, will lead to tenants' displacement—particularly of families with children—and have resulted or will result in the constructive eviction of residents whose conditions have become uninhabitable because of Defendants' systemic failure to maintain the property.  As a result of Defendants' discriminatory policy or practice, Empower DC has also been forced to divert scarce organizational resources that it would have used to increase membership and the organization's political influence around issues of improved public housing outcomes, invested in members' empowerment and training in methods for building ownership and equity with respect to housing, and invested in and hosted leadership development activities for its membership, among other goals.

93. Empower DC has a limited operating budget and only three full time employees.  Accordingly, when Empower DC takes on a new organizing project, this project necessarily diverts both money and human resources from Empower DC's other organizational activities and community initiatives.

94. Instead of providing services to its members and the community, Empower DC has been forced to divert its scarce resources to identifying, investigating, and combating Defendants'

29

discriminatory policies and practices, and to counseling, organizing, and reassuring tenants who fear imminent displacement because of their family size or who have been constructively evicted or fear they will be forced to move as a result of the egregious conditions of their housing—all as a result of the proposed Barry Farm redevelopment.

95. In 2012, Empower DC received a call from a Barry Farm resident who expressed concern about the redevelopment.  The resident claimed that the Barry Farm Resident Council had agreed to support the DCHA redevelopment plan without consulting with the residents and, under pressure from DCHA, without fully understanding the redevelopment plan. Thereafter, Empower DC met with this Barry Farm resident at the resident's request to further discuss the tenant's concerns in relation to the redevelopment, including how, when and where people would be moved off of the property, who would be allowed back and when, and whether they would be given the opportunity to "build in place" as was originally promised residents during an earlier iteration of redevelopment planning.

96. Given this report, Empower DC was compelled to further investigate Barry Farm residents' concerns about the redevelopment.  It thus began meeting with and organizing other residents on the property to ensure tenants could communicate their concerns to DCHA regarding the pending redevelopment, possible displacement, and other related issues.

97. Empower DC assisted tenant leaders in forming a tenant organization that could assert the views of tenants who felt excluded from the planning process—the BFTAA.  After helping the tenants establish the BFTAA, Empower DC helped the organization to convene regular monthly meetings and spent resources notifying and handing out informational fliers about upcoming meetings.

4850-4035-5150.2

98. Empower DC also provided assistance to the BFTAA when it decided to seek party status to challenge the Defendant's First-Stage PUD.  This work entailed outreach, assistance preparing testimony and attendance at three separate hearings before the Zoning Commission, and meetings with various stakeholders between those hearings.

99. After the Zoning Commission approved the First-Stage PUD, Empower DC continued to undertake organizing efforts to resist the discriminatory aspects of the redevelopment plan. These organizing efforts included helping the BFTAA appeal the Zoning Commission's decision, additional outreach to tenants and their potential supporters, facilitating regular tenant meetings, and coordinating advocacy before public officials.

100.   The tenant outreach efforts Empower DC conducted included knocking on doors to provide tenants with informational fliers and ask residents to fill out surveys and sign petitions.  Empower DC's organizers also led in-depth one-on-one interviews with a large number of tenants.

101.   Empower DC has also participated in over a dozen meetings with officials and hearings in order to raise awareness about the proposed redevelopment of Barry Farm, the conditions which current (and now-prior) tenants have had to endure, and the unfair and adverse impact the project will have on families.

102.   As of February 2014, Empower DC has diverted approximately 4,000 hours of its staff members' time to identify and combat Defendants' discriminatory conduct through outreach, organizing, advocacy, and tenant counseling efforts, among other activities. Empower DC will continue to divert it scarce resources to identify and combat such discrimination until Defendants cease their violations of the FHA and the DCHRA.

### E. BFTAA

103.   Plaintiff BFTAA is a tenant-based organization whose members are Barry Farm residents and former Barry Farm residents who seek to avoid displacement from Barry Farm by the planned redevelopment of the property and who wish to reside in the Barry Farm redevelopment, subject to a limited set of tenant demands.  BFTAA members include Barry Farm families with children and households experiencing chronic conditions of gross disrepair.

104.   BFTAA brings this action as a representative of its members whose fair housing rights are being violated and who wish to ensure an equitable redevelopment of the Barry Farm property which maintains a family inclusive community where Barry Farm residents' maintenance needs are timely and adequately addressed at the existing Barry Farm property.

105.   The participation of individual BFTAA members is not required to resolve the claims at issue or to formulate appropriate relief.

### VII. CLASS ALLEGATIONS

106.   Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas ("Class Plaintiffs") bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, or in the alternative as a hybrid class under Rule 23(a) and 23(b)(2) and (3) or under Rule 23(a) and (b)(2) and (c)(4), on behalf of the following subclasses:

> **Families with Children Subclass**:  All households with one or more minor child who reside or have resided, at Barry Farm in a two-, three-, four-, or six- bedroom unit since February 20, 2014 (the date that Defendants proposed their First-stage PUD to the Zoning Commission), and have been or are at risk of being displaced

from a two-, three-, four-, or six-bedroom unit at Barry Farm as a result of the redevelopment.

**Conditions Tenants Subclass**:  All households who reside or have resided at Barry Farm since May 29, 2015 and whose unit had a condition that violated the District of Columbia Housing Code or 24 C.F.R. § 5.703.

107.   The Families with Children Subclass Plaintiffs seek permanent injunctive relief for all members of the proposed subclass so that all members of the proposed subclass will have a future opportunity to reside at Barry Farm or the redeveloped property in a two-, three-, four-, or six-bedroom unit.  The Families with Children Subclass Plaintiffs further seek damages for individuals who have already been displaced from a two-, three-, four-, or six-bedroom unit at Barry Farm since February 20, 2014 or are so displaced at a later date, insofar as their displacement causes distinct and additional harms separate from their loss of housing, including but not limited to monetary costs related to moving services and increased transportation costs to school, daycare, medical facilities, and/or work.

108.   The Conditions Tenants Subclass Plaintiffs seek permanent injunctive relief for all members of the proposed subclass so that all members of the proposed subclass will have their outstanding and ongoing conditions issues immediately addressed by Defendant DCHA and their housing restored to a habitable condition.  The Conditions Tenants Subclass Plaintiffs further seek damages for individuals who have already been displaced from their unit at Barry Farm since February 20, 2014 or are so displaced at a later date as a result of DCHA's failure to maintain the property insofar as their displacement causes a series of additional harms, including the loss of housing, monetary costs related to moving

33

services, and increased transportation costs to school, daycare, medical facilities, and/or work for those who have been moved to units off the property.

109.   This action is properly maintainable as a class action, because the requirements of Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure can be satisfied.

110.   The subclasses are so numerous that joinder of all members is impracticable.   Upon information and belief, at least half the families in Barry Farm are members of the proposed Families with Children Subclass.   Upon information and belief, at least half the households in Barry Farm are members of the proposed Conditions Tenants Subclass.

111.   There are numerous questions of law and fact that are common to each member of the proposed Subclasses.

112.   Defendants' proposed redevelopment will have the same impact on all Families with Children Subclass members, as Defendants' uniform policy and practice of significantly reducing two-, three-, four- and six-bedroom units as part of its redevelopment of the property will make the property unavailable to the Families with Children subclass members.   In particular, common questions of law and fact that apply to each subclass member include, but are not limited to:

    *i.*   Whether Defendants' policy or practice of significantly reducing two-, three-, four-, and six-bedroom units will make subclass members' housing unavailable by impacting subclass members' ability to remain residents of Barry Farm once it is redeveloped;

    *ii.*   Whether Defendants' decision to significantly reduce two-, three-, four-, and six-bedroom apartments from the Barry Farm redevelopment has a disparate impact on families at Barry Farm;

iii. Whether Defendants can prove their redevelopment plan is necessary to achieve a substantial, legitimate, non-discriminatory interest;

iv. Whether Defendants could have adopted an alternative policy or practice that would have had a less discriminatory impact on families with children;

v. Whether Defendants' actions violate § 3604(a) of the Fair Housing Act and the equivalent provision of the DCHRA; and

vi. Whether Defendants may be enjoined from proceeding with their proposed redevelopment that will have an unjustified disparate impact on families with children.

113. DCHA has intentionally systemically failed to maintain Barry Farm in furtherance of its redevelopment by not addressing routine repairs for property tenants within a similar or equivalent timeframe as that provided to Comparator Properties tenants who made routine repair requests within the same timeframe. Its actions will therefore continue to make the housing conditions of the Conditions Tenants Subclass uninhabitable, and will have the same impact on all Conditions Tenants Subclass members. In particular, common questions of law and fact that apply to each subclass member include, but are not limited to:

i. Whether statistical evidence of DCHA's timeframe to address Barry Farm routine maintenance requests from call to completion (at least or more than 15 days in 2015 and at least or more than 17 days in 2016) as compared to the Comparator Properties' timeframe for similar routine repair requests (eight days in 2015 and nine days in 2016) suggests an inference that DCHA intentionally failed to maintain  Barry Farm in furtherance of its redevelopment, in violation of the DCHRA;

4850-4035-5150.2

ii. Whether the statistical performance of maintenance activities at Barry Farm, which shows a pattern of DCHA taking longer to address tenants' routine maintenance repairs as of the year Defendants received Zoning Commission approval for their First-Stage PUD (2015) and into the following year, demonstrates that a discriminatory reason (forced attrition of tenants to further Defendants' redevelopment plan and avoidance of further expenditures in soon-to-be-demolished units) motivated DCHA's conduct, in violation of the DCHRA;

iii. Whether DCHA has a legitimate non-discriminatory reason for its conduct;

iv. Whether Plaintiffs have established evidence that DCHA's claims it cannot repair or restore Barry Farm Conditions Tenants Subclass members' units to habitable conditions because of the imminent redevelopment are pretextual;

v. Whether DCHA's actions violate § 2-1402.21 (a)(4) of the DCHRA;

vi. Whether Plaintiffs have established that DCHA engaged in constructive demolition of the property by means of systemic maintenance neglect before HUD approved its demolition plans;

vii. Whether DCHA's actions violate 42 U.S.C. § 1437p;

viii. Whether Defendants may be enjoined from proceeding with their proposed redevelopment that has resulted in the provision of disparate maintenance to Barry Farm tenants as compared to the maintenance provided to Comparator Properties tenants.

114. Members of the proposed Subclasses have been injured and will be injured by Defendants' failure to comply with the FHA and DCHRA.

115. The claims of the named Families with Children Subclass and Conditions Tenants Subclass Plaintiffs are typical of the claims of the other putative and respective Subclass Members they seek to represent.

    *i.* Families with Children Subclass Plaintiffs challenge a single policy and practice of Defendants through which Defendants have chosen to purposefully significantly reduce two-, three-, four-, and six-bedroom units in the redevelopment as part of the redevelopment of Barry Farm. Plaintiffs' civil rights were accordingly violated in the same manner as all other Families with Children Subclass Members, who were subjected to Defendants' same policy or practice.

    *ii.* Conditions Tenants Subclass Plaintiffs challenge Defendant DCHA's practice through which it has chosen to systemically fail to maintain the Barry Farm property in furtherance of the redevelopment of Barry Farm. Plaintiffs' civil rights were accordingly violated in the same manner as all other Conditions Tenants Subclass Members, who were subjected to Defendant DCHA's same policy or practice.

116. The named Families with Children Subclass and Conditions Tenants Plaintiffs will fairly and adequately protect the interests of the proposed Subclasses. The named Families with Children Subclass and Conditions Tenants Subclass Plaintiffs are aware of no conflict with any other member of the respective subclasses. The named Families with Children Subclass and Conditions Tenants Subclass Plaintiffs understand their obligations as proposed Subclass Representatives, have already taken steps to fulfill them, and are prepared to continue to fulfill their duties as proposed subclass representatives.

117. Defendants have no unique defenses against the named Families with Children Subclass and Conditions Tenants Subclass Plaintiffs that would interfere with them serving as Class Representatives of their respective subclasses.

118. Class Plaintiffs' counsel are experienced in federal court class-action litigation, including in the area of fair housing law.

119. This action may be maintained as a class action pursuant to Rule 23(b)(3) of because the questions of law and fact common to members of the subclasses predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

120. This action may alternatively be maintained as hybrid subclasses under Rule 23(b)(2) and 23(b)(3), in which the Court certifies a Rule 23(b)(2) subclass with respect to the claims for injunctive or declaratory relief for each subclass and a Rule 23(b)(3) subclass with respect to the monetary claims for each subclass, and grants the right to opt out to subclass members regarding monetary relief.

    *i.* Defendants' actions in uniformly significantly reducing two-, three-, four-, and six-bedroom units through the redevelopment applies generally to the members of the Families with Children Subclass. Final injunctive or declaratory relief, therefore, is appropriate with respect to the subclass as a whole. The proposed Families with Children Subclass can satisfy Rule 23(b)(3)'s requirements of predominance and superiority, and to the extent that some of the members of the Proposed Families with Children Subclass have damages, their claims for damages can be adjudicated consistent with Rule 23(b)(3).

*ii.* DCHA's actions in systemically failing to maintain Barry Farm in furtherance of its redevelopment by not addressing routine repairs for property tenants applies generally to the members of Conditions Tenants Subclass. Final injunctive or declaratory relief, therefore, is appropriate with respect to the subclass as a whole. The proposed Conditions Tenants Subclass can satisfy Rule 23(b)(3)'s requirements of predominance and superiority, and to the extent that some of the members of the Conditions Tenants Subclass have damages, their claims for damages can be adjudicated consistent with Rule 23(b)(3).

121. Finally, this action may alternatively be maintained as hybrid subclasses pursuant to Rule 23(b)(2) and (c)(4). Because final injunctive or declaratory relief is appropriate with respect to each respective subclass as a whole, the proposed Families with Children Subclass and Conditions Tenants Subclass may seek injunctive and declaratory relief pursuant to Rule 23(b)(2) for each respective subclass. In addition, the Court may certify issue subclasses pursuant to Rule 23(c)(4), which states that "an action may be brought or maintained as a class action with respect to particular issues," while resolving on an individual basis the claims for damages that some of the proposed Subclass Members or each subclass may have.

122. By resolving the common issues described herein through a single class proceeding, each member of the Families with Children Subclass will receive a determination of whether Defendants' policy or practice of significantly reducing two-, three-, four- and six-bedroom units makes their housing unavailable and has a disparate impact on families in violation of the FHA and DCHRA and whether Defendants have a legal obligation to not adversely affect families in redeveloping Barry Farm.

123.   By resolving the common issues described herein through a single class proceeding, each member of the Conditions Tenants Subclass will receive a determination of whether Defendants have intentionally provided disparate routine maintenance to Barry Farm tenants in furtherance of the redevelopment of Barry Farm and whether Defendants have a legal obligation to not treat Barry Farm residents differently as compared to Comparator Properties tenants because of their place of residence and as a result of Defendants' planned redevelopment of Barry Farm.

124.   Members of the proposed Subclasses do not have a significant interest in controlling the prosecution of separate actions, as a single injunction will provide all Families with Children Subclass and Conditions Tenants Subclass Members the primary respective relief that they seek for the respective subclasses in this litigation.

125.   To Plaintiffs' knowledge, there has been no prior civil rights litigation involving the redevelopment of Barry Farm.

126.   There are no difficulties in managing the subclasses as a class action.

### VII. CLAIMS FOR RELIEF

### COUNT I – Disparate Impact Discrimination on the Basis of Familial Status in Violation of the Fair Housing Act (42 U.S.C. § 3604(a))

**(Against All Defendants by Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, on behalf of themselves and the Families with Children Subclass of similarly situated individuals, BFTAA, and Empower DC)**

127.   Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

128.   Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas bring this claim for themselves and on behalf of all members of the proposed Families with Children Subclass. Plaintiff BFTAA brings this claim on behalf of its members who currently reside in two-,

4850-4035-5150.2

three-, four-, or six-bedroom units at Barry Farm.  Plaintiff Empower DC brings this claim as an organizational plaintiff based on the frustration of its mission and diversion of its resources caused by Defendants' discriminatory acts.

129.   The Fair Housing Act ("FHA") makes it unlawful, among other practices, to "otherwise make unavailable or deny[] a dwelling," to an individual on the basis of familial status. 42 U.S.C. § 3604(a).

130.   Defendants violated the FHA, 42 U.S.C. § 3604(a), by designing and undertaking implementation of a redevelopment plan that will significantly reduce the number of two-, three-, four-, and six-bedroom apartment units at Barry Farm, and thus will have a disparate impact or disproportionate effect on families with children.

131.   Section 3602(k) of the FHA defines familial status as one or more individuals under the age of 18 being domiciled with (1) a parent, legal custodian, or (2) the designee of such parent or legal custodian, with the written permission of such parent or legal custodian.

132.   Under the FHA, "person" is defined to "include[] one or more individuals . . . associations . . . [or] unincorporated organizations." 42 U.S.C. § 3602(d).

133.   Defendants, individually and through their agents, adopted a redevelopment plan that significantly reduces the number of two-, three-, four-, and six-bedroom units at Barry Farm, thus making housing unavailable to families with children residing in these units.

134.   The reduction in two-, three-, four-, and six-bedroom units will have a disparate impact on families who live at Barry Farm based on their familial status.

135.   Defendants injured Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, and the members of the proposed Families with Children Subclass, as well as BFTAA and Empower DC, by undertaking these discriminatory housing practices. Thus, all Plaintiffs,

including similarly situated members of the proposed Families with Children Subclass, the BFTAA, and Empower DC are "aggrieved persons" within the meaning of the FHA, 42 U.S.C. § 3602(i).

136.   By reason of Defendants' unlawful acts or practices, Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, and other members of the proposed Families with Children Subclass have suffered violations of their civil rights, causing damage to them. Most, if not all, members of the proposed Families with Children Subclass, will also suffer deprivation of the full use and enjoyment of their dwellings, and will suffer wrongful displacement from their dwellings and community.

137.   By reason of Defendants' unlawful acts or practices, Plaintiff Empower DC has suffered direct harm by being forced to divert significant financial and staff resources to community organizing, tenant counseling, and resident training efforts intended to Empower DC Barry Farm tenants and having its mission to improve the lives of low- and moderate-income DC residents, particularly public housing tenants, frustrated.

**COUNT II – Disparate Impact Familial Status Discrimination in Violation of the D.C. Human Rights Act (D.C. Code §§ 2-1402.21(a)(1), 2-1402.68)**

**(Against All Defendants by Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas on behalf of themselves and the Families with Children Subclass of similarly situated individuals, BFTAA, and Empower DC)**

138.   Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

139.   Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas bring this claim for themselves and on behalf of all members of the proposed Families with Children Subclass. Plaintiff BFTAA brings this claim as representative of its members who currently reside in two-, three-, four-, or six-bedroom units at Barry Farm.  Plaintiff Empower DC brings this

claim as an organizational plaintiff based on the frustration of its mission and diversion of its resources caused by Defendants' discriminatory acts.

140. The District of Columbia Human Rights Act ("DCHRA") makes it an unlawful discriminatory practice to "refuse or fail to initiate or conduct any transaction in real property" when such refusal is "wholly or partially for a discriminatory reason based on the actual or perceived[] familial status . . . of any individual." D.C. Code § 2-1402.21(a).

141. The DCHRA specifies that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter [Chapter 14. Human Rights] shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68.

142. Defendants injured Plaintiffs and Proposed Class members in violation of the DCHRA, D.C. Code §§ 2-1402.21(a) & 2-1402.68, by designing and undertaking implementation of a redevelopment plan that will reduce the number of two-, three-, four-, and six-bedroom apartment units, resulting in a disparate impact or disproportionate effect on families with who live at Barry Farm.

143. The DCHRA defines familial status as "one or more individuals under 18 years of age being domiciled with: (1) a parent or other person having legal custody of the individual; or (2) the designee, with written authorization of the parent, or other persons having legal custody of individuals under 18 years of age." D.C. Code § 2-1401.02(11A). Further, "[t]he protection afforded against discrimination on the basis of familial status [] applies to any person who is pregnant or in the process of securing legal custody of any individual under 18 years of age."

144. The DCHRA defines "person" to include any "individual," "association," or "organization." D.C. Code § 2-1401.02(21).

4850-4035-5150.2

145.   Defendants adopted a redevelopment plan that significantly reduces the number of two-, three-, four-, and six-bedroom units at Barry Farm, which has the effect of making housing unavailable to families residing in these units.

146.   The reduction in two-, three-, four-, and six-bedroom units will result in a disparate impact on families with children who reside at Barry Farm on the basis of their familial status.

147.   Defendants injured Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, and other members of the Proposed Class and/or the affected members of BFTAA, as well as Empower DC, by committing these discriminatory housing practices.  Accordingly, Plaintiffs are "aggrieved persons" entitled to enforce the DCHRA against Defendants under the DCHRA. D.C. Code § 2-1403.16(a).

148.   By reason of Defendants' unlawful acts or practices, Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, and members of the Proposed Class and/or the affected members of BFTAA have suffered violations of their civil rights, causing damage to them. Most, if not all, of the Proposed Class Members will also suffer deprivation of the full use and enjoyment of their dwellings, and will suffer wrongful eviction and displacement from their dwellings and community.

149.   By reason of Defendants' unlawful acts or practices, Plaintiff Empower DC has suffered direct harm by being forced to reallocate significant financial resources and staff resources to community organizing, tenant counseling, and resident training efforts intended to Empower DC Barry Farm tenants and having its mission to improve the lives of low- and moderate-income DC residents, particularly public housing tenants, frustrated.

4850-4035-5150.2

**COUNT III – Constructive Demolition of Barry Farm property in violation of the United States Housing Act (42 U.S.C.S. § 1437p) as implemented by 24 CFR § 970.25**

**(Against Defendant DCHA only by Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas on behalf of themselves and the Conditions Tenants Subclass of similarly situated individuals, BFTAA, and Empower DC)**

150.  Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, the BFTAA, and Empower DC reallege and incorporate by reference each and every allegation above as if fully set forth herein.

151.  Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas bring this claim for themselves and on behalf of all members of the proposed Families with Children Subclass. Plaintiff BFTAA brings this claim on behalf of its members who currently reside at Barry Farm.  Plaintiff Empower DC brings this claim as an organizational plaintiff based on the frustration of its mission and diversion of its resources caused by Defendants' conduct.

152.  Until receiving approval from HUD to proceed with demolition, the DCHA had an obligation to maintain the Barry Farm property as housing for low-income families, in accordance with all applicable requirements of a landlord under its leases with Barry Farm tenants and the laws and regulations of the District of Columbia, including but not limited to maintaining such rental housing in a safe and inhabitable condition, and to provide full housing services to all residents who continued to reside in Barry Farm.

153.  Since DCHA submitted its First-Stage PUD application to the D.C. Zoning Commission in 2014, it has been engaging in a pattern of actions and failures to act which have created uninhabitable living conditions for Plaintiffs in violation of federal law and regulations. 24 C.F.R. § 970.25.

154.  Defendant DCHA was prohibited from taking any action to demolish Barry Farm without obtaining HUD's approval, as such actions were contrary to its obligation "to maintain and

operate the property as housing for low-income families" prior to obtaining HUD approval for demolition.  Accordingly, Defendant DCHA's actions and omissions have resulted in the *de facto* demolition of units within Barry Farm in violation of 42 U.S.C. § 1437p and 24 C.F.R. § 970.25.

155.  By reason of DCHA's unlawful acts or practices, Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas and members of the Proposed Conditions Tenants Subclass and/or the affected members of BFTAA have suffered violations of their federal statutory rights under 42 U.S.C. § 1983, causing damage to them.  Such damage will produce the imminent and irreparable harm of depriving plaintiffs of the full use and enjoyment of their dwellings, wrongful eviction, and displacement from their community.

156.  By reason of DCHA's unlawful acts or practices, Plaintiff Empower DC has suffered direct harm by being forced to reallocate significant financial resources and staff resources to community organizing, tenant counseling, and resident training efforts intended to Empower DC Barry Farm tenants and having its mission to improve the lives of low- and moderate-income DC residents, particularly public housing tenants, frustrated.

**COUNT IV – Disparate Treatment Place of Residence Discrimination in Violation of the D.C. Human Rights Act (D.C. Code §§ 2-1402.21(a)(4))**

**(Against Defendant DCHA Only by Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, on behalf of themselves and the Conditions Tenants Subclass of similarly situated individuals, BFTAA, and Empower DC)**

157.  Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

158.  Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas bring this claim for themselves and on behalf of all members of the proposed Conditions Tenants Subclass.

46

Plaintiff BFTAA brings this claim on behalf of its members while Plaintiff Empower DC brings this claim on its own behalf.

159.   The DCHRA makes it unlawful "to refuse or restrict facilities, services, repairs or improvements for a tenant or lessee" "wholly or partially for a discriminatory reason based on race, . . . color, . .  or place of residence."   D.C. Code §  2-1402.21 (a)(4).

160.   Defendant DCHA injured Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas, and proposed Conditions Tenants Subclass members, Plaintiff BFTAA's members, and Plaintiff Empower DC, in violation of the DCHRA, D.C. Code § 2-1402.21(a)(4) , by intentionally providing disparate maintenance to Barry Farms residents, on a level below the standard offered at the Comparator Properties, in order to further the Barry Farm redevelopment plan.

161.   As the owner and manager of Barry Farm, Defendant DCHA has an obligation to maintain the units in good repair, and has established a system for responding to maintenance requests at Barry Farm as well as the Comparator Properties.  Upon information and belief, DCHA's system for responding to routine maintenance requests is thus intended to operate similarly across properties.

162.   Since at least May 29, 2015, the DCHA's response time to complete routine maintenance requests by tenants at Barry Farms has, on average, been longer than the response time to completion for maintenance requests made by tenants of the Comparator Properties, which DCHA also owns and manages.

163.   There is no legitimate non-discriminatory reason for such a disparity to exist between response times to complete routine maintenance repairs at different DCHA-owned or DCHA-managed public housing properties such as Barry Farm and the Comparator

Properties.  To the contrary, such response times to complete maintenance repairs, on average, should be comparable, and not disparate.

164.   On information and belief, DCHA has systemically and intentionally failed to timely and/or adequately respond to Barry Farm residents' routine maintenance repairs, resulting in different provision of maintenance services to Barry Farm tenants as compared to similarly situated Comparator Properties tenants, because of the Barry Farm residents' place of residence.

165.   The motivation for DCHA's disparate treatment is to further its redevelopment plan by forcing attrition of Barry Farm tenants, even before demolition, rather than invest in repairs for units which DCHA claims will shortly be demolished.

166.   By reason of DCHA's unlawful acts or practices, Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas and members of the proposed Conditions Tenants Subclass, Plaintiff BFTAA's members, and Plaintiff Empower DC have suffered violations of their civil rights.  Most, if not all of the proposed Conditions Tenants Subclass Members will also suffer deprivation of the full use and enjoyment of their dwellings because of the lack of adequate and timely maintenance.

167.   By reason of Defendants' unlawful acts, Plaintiff Empower DC has suffered direct harm by being forced to reallocate significant financial resources and staff resources to community organizing, tenant counseling, and resident training efforts intended to Empower DC Barry Farm tenants and having its mission to improve the lives of low- and moderate-income DC residents, particularly public housing tenants, frustrated.

WHEREFORE, the Plaintiffs pray that this Court:

A.      Certify this case as a Plaintiff class action by certifying the Families with Children Subclass and Conditions Tenants Subclass pursuant to Rule 23 (a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.      Designate the named, respective individual Families with Children Subclass and Conditions Tenants Subclass Plaintiffs as representatives of their respective Subclasses, and designate Plaintiffs Ismael Vazquez, Sr., Jacqueline Thrash, and Brenda Lucas' counsel of record as Class Counsel for the Families with Children Subclass and Conditions Tenants Subclass;

C.       Declare that in reducing the number of two-, three-, four-, and six-bedroom units from the redevelopment of Barry Farm, Defendants' proposed redevelopment plan violates the Fair Housing Act of 1968 and the District of Columbia Human Rights Act, as well as declare that Defendants are obligated, as a matter of law, to make housing available to families requiring two-, three-, four-, and six-bedroom units as part of its planned redevelopment.

D.      Order any and all injunctive relief that the Court may deem appropriate, including entering a preliminary and permanent injunction: (i) enjoining Defendants from further violations of Plaintiffs' federally-protected rights and rights protected by the District of Columbia; (ii) in particular, enjoining Defendants' implementation of the currently proposed redevelopment unless and until the redevelopment ensures that: housing will remain available for members of the proposed Families with Children Subclass who reside in current two-, three-, four-, and six-bedroom units; and (iii) ordering Defendant DCHA to bring all existing Barry Farm units up to a state of good repair, and requiring the timely response to completion of all existing and future maintenance requests.

E.      Enter judgment awarding Plaintiffs BFTAA, Empower DC, and members of the proposed Families with Children and Conditions Tenants Subclasses compensatory damages and punitive damages, where such damages are appropriate under the FHA and DCHRA;

F.      Award Plaintiffs' costs and reasonable attorneys' fees incurred in this action to the extent allowable by law; and

G.      Grant such other relief to the Plaintiffs as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs, by their counsel and pursuant to Federal Rule of Civil Procedure 38(b), hereby demand a trial by jury on all claims so triable in this action.

Dated: August 29, 2017                                  Respectfully submitted,

_____
Joseph D. Edmondson, Jr. (D.C. Bar No. 433885)
(jedmondson@foley.com)
Brian J. Kapatkin (D.C. Bar No. 983480)
(bkapatkin@foley.com)
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007
Tel: (202) 672-5300
Fax: (202) 672-5399

Jonathan Smith (D.C Bar No. 396578)
(jonathan_smith@washlaw.org)
Matthew Handley (D.C Bar No. 489946)
(matthew_handley@washlaw.org)
Catherine Cone (D.C. Bar No. 1032267)
(catherine_cone@washlaw.org)
Brook Hill (D.C. Bar No. 1044120)
(brook_hill@washlaw.org)
Washington Lawyers' Committee
for Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010

*Attorneys for Plaintiffs*

51