**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                            )
BARRY FARM TENANTS AND ALLIES   )
ASSOCIATION, INC., *et. al.*        )
                                            )
            Plaintiffs,              )
                                            )
        v.                          )
                                            )
DISTRICT OF COLUMBIA HOUSING   ) Civil Action No. 17-1762 (EGS)
AUTHORITY, *et.al.*                )
                                            )
            Defendants.              )
———————————————————— )

<u>**MEMORANDUM OPINION**</u>

**I. Introduction**

   Barry Farm is a historic public housing property located east

of the Anacostia River in Southeast District of Columbia

("D.C."). The property was purchased in 1867 and developed as

one of the first communities for African-American homeowners

after the Civil War. In 2006, the D.C. Council approved a

redevelopment plan to transform Barry Farm from a public housing

property into a mixed-income, mixed-use community. Pursuant to

the redevelopment plan, the existing 444 Barry Farm units will

be demolished and over 1,000 mixed-use, mixed-income units will

be built in their place. The D.C. Housing Authority ("DCHA")

hired private developers Preservation of Affordable Housing

("POAH") and A&R Development ("A&R") to implement the approved

plan (collectively, "defendants").

Plaintiffs are individuals who will be displaced and organizations that will be affected by the redevelopment plan. The plaintiffs' four-count complaint alleges that the defendants' redevelopment plan discriminates against Barry Farm tenants based on their familial status in violation of: (1) the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.;* and (2) the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1402.21(a)(1), 2-1402.68. Plaintiffs also allege that DCHA: (3) failed to maintain the Barry Farm property in violation of the United States Housing Act ("USHA"), 42 U.S.C. § 1437p; and (4) discriminated against Barry Farm tenants based on their place of residence in violation of the DCHRA, D.C. Code §§ 2-1402.21(a)(4). All four counts are alleged against DCHA; the first and second counts are also alleged against POAH and A&R.

Pending before the Court are: (1) DCHA's motion to dismiss the four claims against it, *see* ECF No. 18;[1] and (2) A&R's and POAH's motion to dismiss the two claims against them, *see* ECF No. 13. After careful consideration of the motions, the consolidated response, the replies thereto, the oral argument at the January

---

[1] DCHA originally filed its motion to dismiss on October, 30, 2017. *See* ECF No. 12. However, it filed a substitute filing on December 7, 2017. *See* ECF No. 18. The substitute filing merely added a table of contents and a table of authorities. *Id.*

9, 2018 motions hearing, and the applicable law, the defendants'
motions to dismiss are **GRANTED**.[2]

## II. Background

### A. The Parties

Associational plaintiffs are: (1) the Barry Farm Tenants and
Allies Association, Inc. ("BFTAA"), a non-profit corporation
created by Barry Farm residents to address issues related to the
Barry Farm redevelopment; and (2) Empower DC, a non-profit
corporation that seeks to improve the lives of low- and
moderate-income D.C. residents. Compl., ECF No. 1 ¶¶ 13, 14.
Individual plaintiffs are Ismael Vasquez[3], Jacqueline Thrash, and
Brenda Lucas, current and former Barry Farm residents who bring
the complaint individually and on behalf of two proposed classes
of similarly-situated persons. *Id.* ¶¶ 15-20. The first proposed
class consists of Barry Farm families with children, who allege
that the redevelopment plan discriminates against them based on
their familial status. *Id.* ¶¶ 106, 112. The second proposed
class consists of Barry Farm residents whose units have not been

---

[2] Consequently, the Court need not evaluate the plaintiffs'
motion for a preliminary injunction, which encompasses the same,
now-dismissed claims. *See* Pls.' Mot. for PI, ECF No. 21. The
plaintiffs' motion for a preliminary injunction briefing
schedule and hearing is also denied as moot. *See* ECF No. 27.
[3] In the complaint, Mr. Vasquez' last name is spelled as both
"Vasquez" and "Vazquez."

maintained, allegedly in violation of the USHA and the DCHRA. *Id.* ¶¶ 106, 113.

Plaintiffs bring this action against the entities responsible for implementing the Barry Farm redevelopment plan and maintaining Barry Farm units. DCHA is a D.C. government agency that owns and manages public housing units. *Id.* ¶ 21. In 2013, DCHA hired private developers POAH and A&R to redevelop the Barry Farm property. *Id.* ¶ 33. POAH is a non-profit developer that focuses on housing for low- and moderate-income residents, while A&R is a private developer. *Id.; see also id.* ¶¶ 22, 23.

**B. First-Stage Redevelopment Plan**

In 2005, the D.C. government created the New Communities Initiative to "revitalize severely distressed subsidized housing and redevelop communities plagued with concentrated poverty, high crime, and economic segregation." *Id.* ¶ 28. The program targeted four neighborhoods, one of which is Barry Farm. *Id.* In seeking to create "vibrant mixed-income neighborhoods," the New Communities Initiative established four principles to guide redevelopment. *Id.* ¶ 30. Pursuant to these principles, a redevelopment plan must: (1) ensure one-for-one replacement of affordable housing units in the neighborhood; (2) create opportunities for residents to return to or stay in the community; (3) build mixed-income housing to end the concentration of low-income housing and poverty; and (4) "build

first" to make new housing available before existing housing is demolished. *Id.* With these principles in mind, the D.C. Council created and approved the Barry Farm redevelopment plan in 2006. *Id.* ¶¶ 31, 32. In 2013, DCHA hired POAH and A&R to develop the property. *Id.* ¶ 33.

In February 2014, the defendants filed with the D.C. Zoning Commission a "first-stage Planned Unit Development application" ("first-stage PUD"). *Id.* ¶ 34. The first-stage PUD application sets forth the general parameters for the Barry Farm redevelopment. *Id.* ¶ 35; *see generally* Z.C. Order No. 14-02 ("Z.C. Order"), ECF No. 12-2.[4] For example, the PUD application outlined the redevelopment project's goals and phases and laid out the general demolition and construction plans. *See* Z.C. Order, ECF No. 12-2. The Zoning Commission approved and adopted the defendants' PUD application in December 2014.[5] *Id.* Pursuant

_____

[4] The plaintiffs do not attach the Zoning Commission's Order approving the first-stage PUD application to their complaint. *See generally* Compl., ECF No. 1. However, the Court may take judicial notice of the Order because it is a frequently-cited document "upon which the plaintiff's complaint necessarily relies." *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (quoting *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009)); *Marshall v. Honeywell Tech. Sols., Inc.,* 536 F. Supp. 2d 59, 65 (D.D.C. 2008)("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion [to dismiss] to one for summary judgment.").
[5] The District of Columbia Court of Appeals vacated the Zoning Commission's Order approving the defendants' first-stage PUD

to the Zoning Commission's Order, the defendants will demolish the existing 444 Barry Farm units and replace them with 1,400 residential units of various types. Compl., ECF No. 1 ¶ 38. Of these new units, 344 will be dedicated as low-income, "replacement" units. *Id.* ¶ 38. The remaining units will be a mix of affordable rental units, affordable homeownership units, market-rate rental units, and market-rate homeownership units. Z.C. Order, ECF No. 12-2 ¶ 78d. In January 2017, the U.S. Department of Housing and Urban Development ("HUD") approved the defendants' application to demolish Barry Farm pursuant to the USHA. Compl., ECF No. 1 ¶ 65; *see also* Mot. Hearing Tr., ECF No. 25 at 4:15-19; HUD Approval, ECF No. 24-1 (January 20, 2017).

At issue in this case is the future "unit mix"—or, the number of one-, two-, three-, four-, and six-bedroom units that will comprise the public housing replacement units. Specifically, the plaintiffs allege that the defendants' plan to dramatically increase the number of one-bedroom replacement units will reduce the number of units that can accommodate returning families.

---

application on April 26, 2018. *See Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, Civ. Case No. 15-AA-1000. The next day, this Court ordered the parties to provide their views regarding what impact, if any, the decision had on the instant case. The plaintiffs stated that the decision "does not affect the motions pending," while the defendants asserted that the opinion "provides further support for their motions to dismiss." Joint Status Report, ECF No. 32. In light of these positions, the Court need not evaluate the decision further.

Compl., ECF No. 1 ¶¶ 40, 41. The plaintiffs allege that the defendants "proposed" a unit mix for the replacement units in a July 2014 letter to the Zoning Commission, which included "post-hearing materials" in support of the PUD application. *Id.* ¶ 40 (citing 2014 Letter, Compl. Ex. A, ECF No. 1-1). Ultimately, the Zoning Commission's Order did not contain a future unit mix. *See generally* Z.C. Order, ECF No. 12-2.

In approving the defendants' first-stage PUD application, the Zoning Commission found that the redevelopment plan was suitable in part because it will "meet the needs of the returning residents," who "will be able to return to a unit that includes a bedroom size consistent with their needs." *Id.* ¶ 110. The Zoning Commission found, among other things, that: (1) the redevelopment plan "will provide a one-for-one replacement of all public housing units that are removed from the PUD site;[6]" and (2) the defendants will "undertake an extensive relocation and return process to ensure that current residents have a place to live during redevelopment . . . and to guarantee that those residents can return to the PUD Site after redevelopment if they

---

[6] 100 public housing replacement units been built or are in the process of being built for Barry Farm families – 60 have been built at Matthews Memorial Terrace and 40 are under construction at Sheridan Station Phase III. Compl., ECF No. 1 ¶ 39; Z.C. Order, ECF No. 12-2 ¶ 59. These, together with the 344 replacement units set forth in the PUD application, account for the one-for-one replacement of all public housing units removed from the site. Z.C. Order, ECF No. 12-2 ¶ 59.

choose to do so." *Id.* ¶ 95c. The Zoning Commission conditioned its approval on, among other things: (1) that the 344 dedicated replacement units "shall remain as replacement public housing units for the period required . . . which will be no less than 40 years;" and (2) that the defendants include in each second-stage application "a detailed description of the affordable housing . . . [and] a breakdown of how the affordable housing is distributed in terms of unit type (by number of bedrooms . . .)." *Id.* at 60-61; *see also* Mot. Hearing Tr., ECF No. 25 at 75:15-76:8 (stating that the unit mix for the replacement units will be submitted for approval in second-stage applications).

Second-stage PUD applications are due every two years; there will be four second-stage applications in total. *Id.* at 64. The first second-stage application for the first four land parcels is currently due by May 2019,[7] while the fourth and final second-stage application for all remaining land parcels is currently due by May 2025. *Id.* Each second-stage application is subject to approval by the Zoning Commission. *Id.*

### C. DCHA's Alleged Failure to Maintain Barry Farm Units

Barry Farm has fallen into a "deep state of disrepair." Compl., ECF No. 1 ¶ 58. For example, residents allege that there are holes in the floor and walls, leaking ceilings, broken

---

[7] The Court understands that deadlines may be subject to change. *See* Compl., ECF No. 1 ¶ 49.

appliances and fixtures, broken doors and windows, persistent rodent and insect infestations, broken heating, water damage, and sewage leaks. *Id.* ¶¶ 58, 60. The plaintiffs allege that DCHA is either "non-responsive" or "slow" to fix these many issues, especially when compared to its maintenance record at other public housing properties. *Id.* ¶¶ 55-60. According to the plaintiffs, this is increasingly the case now that the defendants' first-stage PUD application was approved and Barry Farm is slated for demolition. *Id.* ¶ 50. The plaintiffs allege that DCHA has "systematically failed to maintain Barry Farm units in an attempt to clear the property for redevelopment," driven by its decision to "disinvest" in Barry Farm. *Id.* ¶¶ 50, 63. The "uninhabitable" conditions have allegedly caused some tenants to leave; DCHA has allegedly kept those units vacant in anticipation of demolition. *Id.* ¶¶ 50, 58.

## III. Standards of Review

### A. Federal Rule of Civil Procedure 12(b)(1)

"A federal district court may only hear a claim over which it has subject-matter jurisdiction; therefore, a Rule 12(b)(1) motion for dismissal is a threshold challenge to a court's jurisdiction." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 44 (D.D.C. 2017) (internal citation and quotation omitted). To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing that the court has jurisdiction by a

preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely . . . than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011)(internal citations omitted). In so doing, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but the court need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). In reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court "may consider materials outside the pleadings" in determining whether it has jurisdiction to hear the case. *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007) (internal quotations and citations
omitted).

Despite this liberal pleading standard, to survive a motion to
dismiss, a complaint "must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible
on its face*." Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(internal quotations and citations omitted). A claim is facially
plausible when the facts pled in the complaint allow the court
to "draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Id.* The standard does not amount to
a "probability requirement," but it does require more than a
"sheer possibility that a defendant has acted unlawfully." *Id.*

"[W]hen ruling on a defendant's motion to dismiss [pursuant to
Rule 12(b)(6)], a judge must accept as true all of the factual
allegations contained in the complaint." *Atherton v. D.C. Office
of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (internal
quotations and citations omitted). In addition, the court must
give the plaintiff the "benefit of all inferences that can be
derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16
F.3d 1271, 1276 (D.C. Cir. 1994). Even so, "[t]hreadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements" are not sufficient to state a claim.
*Iqbal*, 556 U.S. at 678.

A dismissal of a claim brought pursuant to Section 1983 for lack of an enforceable right amounts to dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Duberry v. District of Columbia*, 824 F.3d 1046, 1050-51 (D.C. Cir. 2016)("Our review of the Rule 12(b)(6) dismissal of the[] amended complaint [for lack of an enforceable right] is *de novo*.").

## IV. Analysis

Defendant DCHA moves to dismiss the complaint, arguing that: (1) the plaintiffs' two claims for discrimination based on familial status (Counts I and II) are not ripe for adjudication, or alternatively, the plaintiffs fail to state a disparate impact discrimination claim; (2) the plaintiffs' constructive demolition claim (Count III) must be dismissed for lack of an enforceable federal right; and (3) the plaintiffs' claim for discrimination based on place of residence (Count IV) must be dismissed for failure to state a claim. *See generally* DCHA's Mot., ECF No. 18.[8] Defendants POAH and A&R move to dismiss the two counts alleged against them for discrimination based on familial status (Counts I and II) because the claims are not ripe for adjudication, or alternatively, for failure to state a

---

[8] When citing electronic filings throughout this opinion, the Court cites to the ECF page number, not the page number of the filed document.

disparate impact discrimination claim. POAH's/A&R's Mot., ECF

No. 13. The Court analyzes each argument in turn.

## A. The Court Lacks Jurisdiction Over Counts I and II Because the Plaintiffs' Claims are Not Ripe for Judicial Review

### 1. The Plaintiffs' Allegations

In Count I, the plaintiffs allege that the defendants have

violated the FHA "by designing and undertaking implementation of

a redevelopment plan that will significantly reduce the number

of two-, three-, four-, and six-bedroom apartment units at Barry

Farm, and thus will have a disparate impact or disproportionate

effect on families with children." Compl., ECF No. 1 ¶ 130. The

plaintiffs further allege that the "[d]efendants, individually

and through their agents, adopted a redevelopment plan that . .

. [will] mak[e] housing unavailable to families with children,"

which "will have a disparate impact on families who live at

Barry Farm based on their family status." *Id*. ¶¶ 133, 134. In

Count II, the plaintiffs allege the same facts to be in

violation of the DCHRA. *Id.* ¶¶ 142, 145-46.

The plaintiffs' allegations are based entirely on a July 2014

letter that the defendants sent to the Zoning Commission

containing "post-hearing materials" in support of their first-

stage PUD application. 2014 Letter, Compl. Ex. A, ECF No. 1-1 at

2 (attached to complaint). This letter provides information

"regarding unit mix and targets" in order to "inform the [Zoning

Commission of] future unit sizes." *Id.* at 4-6. To that end, it included a "possible housing mix" for the Barry Farm replacement units. *Id.* If adopted, the possible mix would add almost 100 one-bedroom units to the existing unit mix, resulting in 163 fewer units with more than one bedroom. *Id.* at 5-6. This possible unit mix was developed after the defendants surveyed current Barry Farm tenants and D.C. residents on the public housing waiting list to learn about their future housing needs. *Id.* at 6.

The possible unit mix described in the July 2014 letter was not incorporated into the Zoning Commission's Order. *See generally* Z.C. Order, ECF No. 12-2. Rather, the Zoning Commission explained that "[a] first-stage PUD involves (i) general review of a site's suitability . . . ; (ii) the appropriateness, character, scale, mixture of uses, and design of the uses proposed; and (iii) the compatibility of the proposed development city-wide . . . and other goals of the PUD process." *Id.* ¶ 150. The Zoning Commission ordered the defendants to include "a detailed description of the affordable[9] housing . . . [and] a breakdown of how the affordable housing is

---

[9] "Affordable housing" includes the replacement public housing units. *See* Mot. Hearing Tr., ECF No. 25 at 75:15-76:8 (stating that the unit mix for the replacement units will be submitted for approval in second-stage PUD applications).

distributed in terms of unit type (by number of bedrooms . . .)"
in their second-phase PUD applications. *Id.* at 61.

### 2. Familial Status Disparate Impact Discrimination

The plaintiffs contend that the defendants discriminated
against Barry Farm families on the basis of familial status by
"adopt[ing]" a redevelopment plan that will reduce the number of
available larger units. Compl., ECF No. 1 ¶¶ 127-149. The FHA
prohibits "mak[ing] unavailable ... a dwelling to any person
because of ... familial status." *Borum v. Brentwood Vill., LLC*,
218 F. Supp. 3d 1, 20-21 (D.D.C. 2016) (quoting 42 U.S.C. §
3604(a)). "'Familial status' means one or more individuals (who
have not attained the age of 18 years) being domiciled with ...
a parent or another person having legal custody of such ...
individuals,' or the parent's designee." *Id.* (quoting 42 U.S.C.
§ 3602(k)). Therefore, to state a claim for "familial status"
disparate impact discrimination, plaintiffs must "offer
sufficient evidence to support a finding that the challenged
policy *actually* disproportionally affected a protected class,"
in this case families with minor children. *2922 Sherman Ave.
Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 681 (D.C.
Cir. 2006)(emphasis in original).

### 3. The Parties' Arguments

The defendants move to dismiss these two disparate impact
counts for lack of jurisdiction. Since the allegations are based

"solely" on the "proposed unit mix numbers" presented in the
July 2014 letter, the defendants argue that the claims are not
ripe for judicial review. According to the defendants, the
possible mix set forth in the letter does not necessarily
reflect the actual unit mix that defendants will build. DCHA's
Mot., ECF No. 18 at 12-14; POAH's/A&R's Mot., ECF No. 13 at 20-
24. Instead, the defendants contend that the possible mix was
meant to inform the Zoning Commission of the potential needs of
the returning residents. *See id.* The defendants state that they
have not determined the final unit mix and are not required to
do so at this time. DCHA's Mot., ECF No. 18 at 12-13. They also
state that they will "consider the needs of Barry Farm
residents" in determining and submitting to the Zoning
Commission for approval the future unit mix. *Id.* at 13.[10]

The plaintiffs respond that they have presented a concrete
dispute fit for judicial review because the defendants have
"publicly outlined their current expectations of the unit mix,"
which will substantially reduce the number of available units

---

[10] The DCHA Board of Commissioners promulgated a Resolution
formally adopting their "relocation and re-entry policies for
[New Communities Initiative] developments." *See* DCHRA Resolution
16-06. The Resolution "establishes guidelines under which
residents are eligible to return to their original development,"
and mandates that "eligible residents have a right to a unit
[that] fits their household size . . . even if their household
grows during the relocation period." *Id.* ¶ 2. The Court may take
judicial notice of such public records. *See Kaempe v. Myers*, 367
F.3d 958, 965 (D.C. Cir. 2004).

suitable for families. Pls.' Opp'n, ECF No. 16 at 13, 12-20.

According to the plaintiffs, they will be harmed if they are

"dispossessed" and told to "wait and see," without any guarantee

that they will be able to return to an appropriately-sized unit.

*Id.* at 13. Additionally, the plaintiffs argue that a claim is

ripe under the FHA even if an injury has not yet occurred, so

long as there is a threat of a future injury. *See id.* at 14-15.

Because the defendants have purportedly taken "concrete steps"

to implement the redevelopment plan, the plaintiffs contend that

there is a sufficient threat of future injury. *Id.* at 16.

### 4. Analysis

When a claim is not ripe for judicial review, a court lacks

subject matter jurisdiction and must dismiss the claim pursuant

to Federal Rule of Civil Procedure 12(b)(1). *See Delta Airlines,*

*Inc. v. Exp.-Imp. Bank*, 85 F. Supp. 3d 250, 269 (D.D.C. 2015).

"Ripeness is a justiciability doctrine designed 'to prevent the

courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from

judicial interference until an administrative decision has been

formalized and its effects felt in a concrete way . . . .'"

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,* 538 U.S. 803, 807–

08 (2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49

(1967)). "A claim is not ripe for adjudication if it rests upon

17

contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998)(citations and quotations omitted).

"Determining whether [an action] is ripe for judicial review requires [the Court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n,* 538 U.S. at 808. "The fitness of an issue for judicial [review] depends on . . . whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. Envtl. Prot. Agency*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citations and quotations omitted). The requirement is therefore "primarily meant to protect the agency's interest in crystalizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication . . . ." *Am. Petroleum Inst. v. Envtl. Prot. Agency,* 683 F.3d 382, 387 (D.C. Cir. 2012) (citations and quotations omitted).

Here, the plaintiffs have not presented an issue that is currently fit for judicial review. Their allegations that the defendants designed, begun implementing, and adopted a redevelopment plan that discriminates against them are belied by both the July 2014 letter and the Zoning Commission's Order

approving the first-stage PUD application. Thus, their
allegations are not supported by the very facts that they
reference. While the plaintiffs are deservedly anxious about
their ability to return to their community, the unit mix is
clearly not final; it has neither been proposed to the Zoning
Commission, nor adopted by it. As stated in the July 2014
letter, "[t]he bedroom count for the 344 Barry Farm/Wade Road
replacement public housing units . . . *will be* determined by the
bedroom needs of the returning DCHA households." 2014 Letter,
Compl. Ex. A, ECF No. 1-1 at 6 (emphasis added).

   This understanding was confirmed in the Zoning Commission's
Order, in which the defendants were directed to include in
"subsequent second-stage applications" "a detailed description
of the affordable housing . . . as well as a breakdown of how
the affordable housing is distributed in terms of unit type (by
number of bedrooms . . .)." Z.C. Order, ECF No. 12-2 at 61. By
mandating that the defendants include the unit mix in the
future, the Zoning Commission confirmed that it neither
considered the "possible" mix in the 2014 letter a proposal, nor
approved it as such. *See generally id.;* 2014 Letter, Compl. Ex.
A, ECF No. 1-1. The plaintiffs acknowledge this lack of finality
in their complaint: "[the Zoning Commission made it] clear that
defendants can continue to change the unit mix they propose for
the redevelopment." Compl., ECF No. 1 ¶ 47.

Because the unit mix has not yet been determined, this controversy is the very type of "abstract disagreement" that the ripeness doctrine was designed to prevent. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08. For example, if the defendants include a unit mix in their second-stage applications that comports with the needs of returning families, those families will not have been discriminated against on the basis of familial status. This result is consistent with the "unspoken element of the rationale underlying the ripeness doctrine: if [the Court] do[es] not decide [the case] now, [it] may never need to." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). This rationale not only "protect[s] the expenditure of judicial resources, but it [also] comports with [the courts'] theoretical role as the governmental branch of last resort." *Id.* (citation omitted).

The plaintiffs argue that the possible bedroom mix is "concrete and being implemented" because the defendants have "embarked on concrete steps to redevelop" Barry Farm. Pls.' Opp'n, ECF No. 16 at 14-16. As examples, the plaintiffs point to the ninety-day eviction notices that the defendants began issuing to Barry Farm residents and the fact that HUD approved the defendants' raze application, allowing them to demolish the property. *Id.* at 16.

The plaintiffs rely on *Mt. Holly Citizens in Action, Inc. v. Township of Mount Holly*, for the proposition that an FHA case is ripe if a defendant takes substantial steps toward implementing a plan, even if an injury has not yet occurred. *Id.* at 17-18 (citing and discussing Civ. Case No. 08-2584, 2008 WL 4757299 (D.N.J. Oct. 28, 2008)). In that case, the plaintiffs' FHA claim was found to be ripe even though the defendants' plan to acquire and demolish their homes was not final and had not been fully implemented. 2008 WL 4757299 at *3-4. The claim was ripe because the town had taken significant action to force the plaintiffs from their homes. *Id.* For example, the town council passed an ordinance that authorized eminent domain, declaring that the defendant "is or will be the owner of all the homes in the redevelopment area." *Id.* at *3. In light of this action, it was abundantly "clear" that the defendants intended to take the plaintiffs' homes. *Id.* at *4.

In the instant case, however, the plaintiffs have not alleged that the defendants have taken any action that suggests that the possible unit mix will be implemented. *See generally* Compl., ECF No. 1. Unlike the defendants' plan in *Mt. Holly*, it is merely speculative that the possible unit mix described in the July 2014 letter will be proposed or adopted. Although the defendants have taken concrete steps to implement the redevelopment plan by, for example, submitting the PUD application for approval,

the plaintiffs are not challenging as discriminatory the redevelopment plan in general. Rather, the plaintiffs specifically challenge as discriminatory the possible unit mix submitted to the Zoning Commission in the 2014 letter. *See* Compl., ECF No. 1 ¶¶ 127-149; 2014 Letter, Compl. Ex. A, ECF No. 1-1. Unlike the redevelopment plan generally, the defendants have taken no action to implement this "possible" mix.

   Citing *Cabrini-Green Advisory Council v. Chicago Housing Authority*, the plaintiffs also argue that their claim is ripe notwithstanding the fact that there are some outstanding "uncertain contingencies." Pls.' Opp'n, ECF No. 16 at 17. In *Cabrini-Green*, a Northern District of Illinois district court found that the plaintiff's case was ripe even though the city housing authority's redevelopment plan was not final. Civ. Case No. 96-6949, 1997 WL 31002 at *5-7 (N.D. Ill. Jan. 22, 1997). The court reached this conclusion in part because the defendants' process for creating its redevelopment plan was unlawful and denied the plaintiff the opportunity to participate. *Id.* at *6-7. The plaintiff and the defendants had entered into a memorandum of agreement that provided, among other things: (1) that the residents would be relocated in the redevelopment area; and (2) that the plaintiff would be permitted to meet with the defendant to develop the plan for the property. *Id.* at *1. The defendants failed to meet these

obligations when it alone developed a plan that would have demolished 1,300 public housing units and rebuilt only 300 replacement units. *Id.* at *7. The defendants' actions therefore presented a concrete dispute for judicial resolution because they breached the agreement, resulting "inevitably" in the violations alleged in the complaint. *Id.*

Unlike *Cabrini-Green*—in which the "crucial issue" was not "whether the plan is merely in outline or final form"—the crucial issue here is whether the proposed bedroom mix reflects what will eventually be built. *Id.* at *7. Without knowing the final proposed unit mix, the Court cannot assess whether it has a discriminatory impact on families.

Having found the plaintiffs' claims unfit for judicial resolution, the Court need not determine whether the plaintiffs will suffer hardship without review. *See Delta Airlines, Inc. v. Exp.-Imp. Bank*, 85 F. Supp. 3d 250, 272 (D.D.C. 2015). At this early stage in redevelopment, the plaintiffs cannot challenge a unit mix that does not yet exist. Because these claims are not yet ripe for judicial review, the Court lacks subject matter jurisdiction over them. Pursuant to Federal Rule of Civil Procedure 12(b)(1), Counts I and II are **DISMISSED**.[11]

---

[11] Because the Court finds that the plaintiffs' claims are not ripe, it need not evaluate whether the plaintiffs stated a disparate impact claim pursuant to the FHA and the DCHRA.

23

## B. Count III is Dismissed Because the Applicable Provisions of the USHA Do Not Confer a Federal Right Enforceable Through 42 U.S.C. § 1983

The plaintiffs allege that DCHA violated the USHA by constructively demolishing Barry Farm units without HUD approval as required by 42 U.S.C. § 1437p ("Section 1437p") and 24 C.F.R. § 970.25. Compl., ECF No. 1 ¶¶ 150-156. The plaintiffs allege that DCHA had an obligation to maintain their units until HUD approved DCHA's demolition application in January 2017.[12] *Id.* ¶ 152. By failing to do so, the plaintiffs allege that DCHA constructively demolished Barry Farm units. *Id.* ¶ 153. The plaintiffs seek to vindicate their alleged federal right under the USHA via 42 U.S.C. § 1983 ("Section 1983"). *Id.* ¶ 155.

DCHA argues that the plaintiffs' claim should be dismissed because Section 1437p does not create a federal right to pursue a construction demolition claim through Section 1983. DCHA's Mot., ECF No. 18 at 18-21. Whether the current version of Section 1437p creates a federal right enforceable through Section 1983 is an issue of first impression in this Circuit.

---

[12] Because HUD approved DCHA's demolition application in January 2017, the plaintiffs seek only damages for DCHA's alleged constructive demolition predating January 20, 2017. Compl., ECF No. 1 ¶ 65; Mot. Hearing Tr., ECF No. 25 at 94:5-18 (stating that the claim is not moot because damages are available).

## 1. Private Rights of Action Enforceable Via Section 1983

Section 1983 imposes liability on anyone[13] who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 thus confers a private right of action to safeguard certain rights created by federal statutes. Therefore, to bring a Section 1983 claim, a plaintiff must assert a violation of a federal *right*, not merely a violation of federal *law*. *See Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989).

To determine whether a federal statute gives rise to an enforceable right, the Supreme Court established a three-part test: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997)(citations and quotations omitted).

---

[13] It is undisputed that DCHA may be subject to liability under Section 1983. *See generally* DCHA Mot., ECF No. 18; *see also Long v. District of Columbia Hous. Auth.*, 166 F. Supp. 3d 16, 32-34 (D.D.C. 2016)(analyzing the plaintiff's procedural due process claim against DCHRA pursuant to Section 1983).

In 2002, the Supreme Court clarified the first factor, finding that Congress must do more than clearly confer a *benefit* upon a plaintiff, but rather must clearly confer a *right* upon individuals. *Gonzaga v. Doe*, 536 U.S. 273, 283 (2002) (finding that Section 1983 confers a remedy *only* for deprivations of "rights, privileges, or immunities secured by the Constitution and laws of the United States, ... not the broader or vaguer 'benefits' or 'interests'"). The statute at issue must therefore be "unmistakabl[y] focus[ed] on the benefitted class." *Id.* at 284. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander v. Sandoval,* 532 U.S. 275, 289 (2001)(quotations and citations omitted). Therefore, to find that Section 1437p meets the first *Blessing* factor, the Court must determine whether Congress manifested an unambiguous intent to confer an individual right via Section 1983. The burden to "demonstrate[] that a statute confers an individual right" rests with the plaintiff. *Gonzaga*, 536 U.S. at 284.

Since *Blessing*, "[the Supreme] Court's approach to [Section] 1983 enforcement of federal statutes has been increasingly restrictive; in the end, very few statutes are held to confer rights enforceable under [Section] 1983." *Long v. District of Columbia Hous. Auth.*, 166 F. Supp. 3d 16, 29 (D.D.C. 2016)

(quoting *Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 360 (5th Cir. 2006)).

### 2. The USHA and 42 U.S.C. § 1437p

The USHA is a federal grant-in-aid program, pursuant to which the government provides funds to local public housing authorities ("PHAs") and in exchange, the PHAs comply with an assortment of conditions. *Edwards v. District of Columbia*, 821 F.2d 651, 652 (D.C. Cir. 1987). Among other things, the USHA regulates rent calculation, leases, tenant selection, and demolition or disposition of housing projects. *Id.* The provision relevant here, Section 1437p, regulates the "demolition and disposition of public housing." 42 U.S.C. § 1437p.

The current version of Section 1437p was passed by Congress and signed into law in 1998. *See* Pub. L. No. 105-276 (1998). In *Edwards v. District of Columbia*, the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") determined that a prior version of Section 1437p did not create a federal right such that a public housing tenant may pursue a constructive demolition claim via Section 1983. 821 F.2d 651, 659-60 (1987)("In short, neither the language nor the legislative history of [Section] 1437p creates rights in public housing tenants against the constructive demolition of their units."). Shortly thereafter, however, Congress amended Section 1437p to

legislatively overrule *Edwards*.[14] *See* Pub. L. No. 100-242 (1988);

*see also* H.R. Conf. Rep. 100-426, at 172 (1987)(the legislation

"contains a provision clarifying that no PHA shall take any

steps toward demolition and disposition without having satisfied

the statutory criteria. This provision is intended to correct an

erroneous interpretation of the existing statute by the United

States Court of Appeals for the D.C. Circuit in *Edwards* v.

*District of Columbia* and shall be fully enforceable by tenants

of and applicants for the housing that is threatened").

Approximately ten years later in 1998, Congress amended the

USHA again. Relevant to the claims in the instant case, the

amendments "changed both the general standard for approval of

applications for demolition or disposition of public housing

stock, and many of the specific procedures for these actions,"

---

[14] The amendment added the following subsection: "A public housing agency shall not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining the approval of the [HUD] Secretary and satisfying the conditions specified in subsections (a) and (b)[listing certification criteria]." Pub. L. No. 100-242, § 121 (1988). The implementing regulations set forth at 24 C.F.R. 970.12 provided as follows: "A PHA may not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining HUD approval under this part. Until such time as HUD approval may be obtained, the PHA shall continue to meet its ACC obligations to maintain and operate the property as housing for low-income families. This does not, however, mean that HUD approval under this part is required for planning activities, analysis, or consultations, such as project viability studies, comprehensive modernization planning or comprehensive occupancy planning." 53 Fed. Reg. 30989 (1988).

69 Fed. Reg. 75188 (2006), by "chang[ing] . . . the burden of proof required for HUD approval of an application for demolition or disposition. Rather than HUD having to independently make certain findings, as long as the PHA certifies truthfully to the relevant factors, HUD will approve the application." 71 Fed. Reg. 62354 (2006). Critically, Congress did not include the language that had been added to overrule the *Edwards* decision to clarify that the then-existing statute created a private right of action enforceable through Section 1983. *See* Pub. L. No. 105-276 (1998). The legislative history does not explain why that provision was not included in the amended USHA. *See generally* H.R. Conf. Rep. 105-789 (1998).

In 2006, HUD announced the final rules implementing the amended statute. Relevant to the constructive demolition claim, the regulations provide:

> A PHA may not take any action to demolish or dispose of a public housing development or a portion of a public housing development without obtaining HUD approval under this part. HUD funds may not be used to pay for the cost to demolish or dispose of a public housing development or a portion of a public housing development, unless HUD approval has been obtained under this part. Until the PHA receives HUD approval, the PHA shall continue to meet its ACC obligations to maintain and operate the property as housing for low-income families. However, the PHA may engage in planning activities, analysis, or consultations without seeking HUD approval. Planning activities may include project viability studies, capital planning, or

comprehensive occupancy planning. The PHA must continue to provide full housing services to all residents that remain in the development.

24 C.F.R. § 970.25. These regulations are substantially similar to the prior implementing regulations. *Compare* 24 C.F.R. § 970.12 (2005), *with* 24 C.F.R. § 970.25 (2018).

In promulgating this regulation, HUD noted that the amendment that legislatively overruled *Edwards* had been removed from the new version of the statute:

> Former section 18(d) of the 1937 Act was removed. That section provided that a PHA could not "take any action" to demolish a public housing project, or portion of a project, without HUD approval. Similar language in 24 CFR 970.7(a) and 970.25(a) is designed to make certain that HUD can track units being phased out for funding purposes. That language is not intended to create any private right of action.

71 Fed. Reg. 62354 (2006). Of course, HUD's view of whether a statute creates an enforceable right is not determinative. The Court must evaluate whether the statute itself creates the right. *See Sandoval*, 532 U.S. at 291 (confirming that the enforceable right must exist in the statute).

### 3. The Current Version of Section 1437p Does Not Confer a Federal Right Enforceable through Section 1983

DCHA argues that Section 1437p does not create an enforceable right because the statute is directed at the HUD Secretary and "only relates to the relationship between HUD and PHAs." DCHA's

Mot., ECF No. 18 at 20-21. It does not implicate the plaintiffs'
relationship with DCHA, as *Blessing* and *Gonzaga* require. *See id*.
Furthermore, DCHA argues that because Congress "intentionally
removed" subsection (d) of the 1987 statute—the provision that
overruled *Edwards* and created a private right of action—the
"logical inference" is that Congress intended to remove the
enforceable right that it had created. *Id.* at 20.

The plaintiffs respond that because "no new right of action
was created by the 1987 Amendment, none was taken away when the
1998 Amendments removed the 'new' subsection (d) language." *Id.*
at 40 (discussing H.R. Conf. Rep. 100-426 (1987)("[the amendment
was] intended to correct an erroneous interpretation of the
*existing* statute")). The plaintiffs also argue that the 1998
"comprehensive overhaul" of the USHA actually "elevated the
private rights of public housing residents." *Id.* at 41-42. They
point to the General Provisions section of the 1998 amended
legislation, which declares that the policy of the United States
is to, among other things, include "appropriate accountability
to public housing residents," and "to promote and protect the
independent and collective actions of private citizens to
develop housing and strengthen their own neighborhoods." *Id.*
(quoting Pub. L. No. 105-276 (1998)). Finally, the plaintiffs
argue that HUD's implementing regulations, which codify the

duties owed by PHAs to tenants, create enforceable rights as federal law. *Id.* at 42.

To the Court's knowledge, whether certain provisions of the amended version of Section 1437p create enforceable rights has only been considered in two cases, both outside of this Circuit.[15]

*Anderson v. Jackson* is the only case in which a court examined whether the current version of Section 1437p provides a private right of action for a constructive demolition claim. 556 F.3d 351, 358 (5th Cir. 2009). Without specifying which specific subsections in Section 1437p were relevant to a constructive demolition claim, the Fifth Circuit concluded that Section 1437p did not create an enforceable right because the provision was

---

[15] There are two other cases in which courts found that Section 1437p conferred a federal right enforceable through Section 1983. However, these cases interpreted the post-1998 statute as if it had not been amended and relied entirely on cases that interpreted the 1987 provision. *See English Woods Civic Ass'n v. Cincinnati Metro. Hous. Auth.*, Civ. Case No. 1:03-186, 2004 WL 3019505 (S.D. Ohio Dec. 17, 2004); *Givens v. Butler Metro. Hous. Auth.*, Civ. Case No. 1:03-502, 2006 WL 3759702 (S.D. Ohio Dec. 19, 2006). Thus, this precedent is of limited use. Other courts have encountered the issue, but were unable to resolve it. In *Long v. District of Columbia Housing Authority*, Judge Contreras was not able to determine whether Section 1437p conferred an enforceable right because the parties' briefing did not adequately address this "key issue." 166 F. Supp. 3d 16, 29 (D.D.C. 2016). The First Circuit also did not evaluate whether Section 1437p conferred an enforceable right because the issue was not raised on appeal and the case could be dismissed on other grounds. *See Aponte-Rosario v. Acevedo-Vila,* 617 F.3d 1, 5-6 (1st Cir. 2010). However, the First Circuit noted that it "harbored doubts" as to whether a private right existed. *Id.*

directed explicitly at HUD, placing the "onus of compliance on the federal government." *Id.* Therefore, the provision did not confer a private right of action because it was focused on the entity regulated—HUD—and not the residents of the housing development. *Id.* The Fifth Circuit also determined that it was logical to infer that Congress intended to remove the enforceable right that it had created when it removed subsection (d) in 1998. *Id.* Ultimately, the Fifth Circuit concluded that "the repeal of the provision added in 1987, combined with the text and structure of the current statute, makes it at least ambiguous as to whether Congress intended for the current version of § 1437p to create a federal right." *Id.*

In the second case, a Northern District of California district court considered whether a specific subsection of Section 1437p conferred an enforceable right. *See Arroyo Vista Tenants Association v. City of Dublin*, Civ. Case No. 07-5794, 2008 WL 2338231 (N.D. Cal. May 23, 2008). In that case, the plaintiffs sued a PHA for failing to notify tenants of upcoming public housing demolition and for failing to provide them with relocation assistance, as the PHA had certified to HUD it would do pursuant to Subsection (a)(4) of Section 1437p. *Id.* at *6. Judge Patel examined the text of the relevant subsection, which lists the criteria that a PHA must certify in its demolition application regarding notification and relocation assistance,

and found that the subsection contained "individually-focused terminology" and "right-creating language unmistakably focused on the benefitted class, i.e. the residents of the public housing project who will be displaced if an application for disposition or demolition is approved." *Id.* at *11 (discussing § 1437p(a)(4)). Judge Patel was also "persuaded that Congress intended section 1437p to create individually enforceable rights" because the legislative history implied that the private right of action existed prior to the 1987 amendment. *Id.* at *12. Judge Patel did not consider whether there was a private right of action available for a constructive demolition claim because that claim was not before her. *See id.* at *6 ("To be clear, . . . the court need not decide whether other subsections of 1437p . . . also create individually enforceable rights.").

This Court must first determine whether Congress unambiguously intended to create a federal right. *Gonzaga*, 536 U.S. at 285. To create an enforceable right, Congress must "speak[] with a clear voice and manifest[] an unambiguous intent to confer individual rights." *Id.* at 280 (citations and quotations omitted). The provision at issue "must be 'phrased in terms of the persons benefited.'" *Id.* at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n. 13 (1979)). If the "statute by its terms grants no private rights to any identifiable class," the "question whether Congress intended to create a private right of

action is definitively answered in the negative." *Id.* at 283-84 (citations and quotations omitted).

The Court must begin by identifying the alleged federal right and the specific statutory provisions relevant to that right. "Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights." *Blessing*, 520 U.S. at 342 (internal citation omitted). After isolating the specific claim, the court focuses on the specific statutory provision at issue. *Id.* at 342, 346. Some paragraphs in a code section may confer individually enforceable rights even if others do not. *Arroyo*, 2008 WL 2338231 at *3.

The plaintiffs' core allegation underlying this claim is that DCHA "was prohibited from taking any action to demolish Barry Farm without obtaining HUD's approval, as such actions were contrary to its obligation 'to maintain and operate the property as housing for low-income families' . . . . [its] actions and omissions have resulted in the *de facto* demolition of units within Barry Farm in violation of 42 U.S.C. § 1437p and 24 C.F.R. § 970.25." Compl., ECF No. 1 ¶ 154. The plaintiffs acknowledge that "[t]his express prohibition is not contained in the current text of the [USHA] itself, but in the HUD regulations promulgated thereunder." Pls.' Opp'n, ECF No. 16 at

38. Indeed, the plaintiffs do not specify which provision of Section 1437p creates the right that they seek to enforce.

It is well-settled that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 532 U.S. at 291. Therefore, the Court considers which specific provisions in Section 1437p could conceivably give rise to an enforceable constructive demolition claim. There are two subsections in Section 1437p potentially relevant to plaintiffs' claims. Subsection (a)(1)(A) and Subsection (a)(3) provide in relevant part:

> [U]pon receiving an application by a public housing agency for authorization, with or without financial assistance under this subchapter, to demolish . . . a public housing project . . . the Secretary shall approve the application, if the [PHA] certifies – (1) in the case of – (A) an application proposing demolition of a public housing project . . ., that – (i) the project . . . is obsolete as to physical condition, location, or other factors, making it unsuitable for housing purposes; and (ii) no reasonable program of modification is cost-effective to return the public housing project . . . to useful life; and . . . (3) that the [PHA] has specifically authorized the demolition or disposition in the public housing agency plan, and has certified that the actions contemplated in the public housing agency plan comply with this section[.]

42 U.S.C. § 1437p(a). Subsection (b) requires that the HUD Secretary reject an application if it lacks any of the necessary certifications. § 1437p(b).

Section 1437p(a)(1)(A) and (a)(3) are directed at the HUD Secretary, mandating that the Secretary approve a PHA's demolition application if the PHA makes the required certifications. These subsections, unlike subsection (a)(4), which was analyzed in detail in *Arroyo*, lack the "right-creating" language critical to demonstrating unambiguous congressional intent to create an enforceable right. *See Gonzaga*, 536 U.S. at 287. In *Arroyo*, Judge Patel found that subsection (a)(4), which is not relevant to the constructive demolition claim before this Court, "contains right-creating language unmistakably focused on the benefitted class, i.e., the residents of the public housing project." *Arroyo*, 2008 WL 2338231 at *11 (discussing terminology found in the subsection including: "each family residing in a project subject to demolition," "each resident to be displaced," "residents who are displaced," "residents residing in the building"). In contrast, the provisions relevant to the constructive demolition claim do not mention the public housing residents at all. *Compare* § 1437p(a)(1)(A), (a)(3) *with* § 1437p(a)(4).

Indeed, the subsections relevant to the plaintiffs' constructive demolition claim read like "an administrative

checklist" of the certifications that the PHA must make for the Secretary to approve the application for demolition. *Anderson*, 556 F.3d at 358; *see* 42 U.S.C. § 1437p(a)(1)(A), (a)(3). The provision is focused on the entity regulated—HUD—and not the public housing residents. *See* § 1437p(a)(1)(A), (a)(3); *see also Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.")(citations and quotations omitted). While the relevant subsections list the information that a PHA must certify in a demolition application, they command action only from the HUD Secretary. *See* § 1437p(a)(1)(A),(a)(3). "By directing the statutory command to the Secretary of HUD, Congress placed the onus of compliance on the federal government." *Anderson*, 556 F.3d at 357.

The relevant subsections of Section 1437p are similar to the provision at issue in *Gonzaga v. Doe*. In that case, a student sued a private university for releasing his private records in violation of the Family Educational Rights and Privacy Act of 1974. 536 U.S. at 277. The Supreme Court concluded that there was "no question" that the provision at issue failed to confer enforceable rights. *Id.* at 287. Like the relevant subsections of Section 1437p, the provisions lacked "rights-creating language" and spoke "only to the Secretary of Education" in directing that

no funds shall be made available to an institution that disclipses private records in violation of the Act. *Id.* As with the relevant subsections of Section 1437p, the focus of the provision was "removed" from the interests of the affected individuals, and thus did not confer an enforceable individual entitlement under Section 1983. *Id.*

Moreover, in both *Blessing* and *Gonzaga*, the Supreme Court examined the "mechanism that Congress chose to provide for enforcing [the relevant] provisions." *Gonzaga*, 536 U.S. at 289; *Blessing*, 520 U.S. at 344. In *Gonzaga*, Congress "expressly authorized the Secretary of Education to deal with violations of the Act," suggesting that the remedy for violations was not individual suits but withholding federal funds from the school. *Id.* at 289. In *Blessing*, a violation of the Social Security Act was not enforceable through individual litigation, but rather by reducing the state's federal grant funding. 520 U.S. at 344. The Secretary could not "command the State to take any particular action or to provide any services to certain individuals." *Id.* Therefore, the provision was intended to trigger penalty provisions, not confer an individual right. So here too. If a PHA fails to provide the required certifications, the remedy is HUD's denial of the faulty application. 42 U.S.C. § 1437p(a).

Citing the "Declaration of Policy" section of the amended USHA, the plaintiffs argue that the new statute elevates the

rights of public housing residents. Pls.' Opp'n, ECF No. 16 at 41-42 (citing Pub. L. No. 105-276, § 505). However, the Court cannot use a "blanket approach" in determining whether a statue creates enforceable rights. *Gonzaga*, 536 U.S. at 294 (Stevens, J. dissenting)(quoting *Blessing*, 520 U.S. at 344)). The Court must, as it did here, examine the "precise statutory provision at issue" for such "rights-creating" language. *Id.* And as discussed above, the specific provisions at issue do not contain rights-creating language. *See* 42 U.S.C. § 1437p.

The crux of the plaintiffs' argument is that the enforceable right existed somewhere in the statute before it was amended in response to *Edwards*. Therefore, their alleged federal right continues to exist even though the post-*Edwards* clarifying provision is not in the current version of the statute. *See* Pls.' Opp'n, ECF No. 16 at 39 ("it was Congress' view that [a private right of action] existed prior to the 1987 Amendment, and as such, continues to exist even though the statutory language that was added in 1987 was later removed in 1998"). True, Congress clearly intended to overrule *Edwards* to create a private right of action when it added subsection (d) in 1987. H.R. Conf. Rep. 100-426, at 172 (1987). However, it does not necessarily follow that the private right of action was not "taken away" when the provision was removed in 1998. Pls.' Opp'n, ECF No. 16 at 40. By amending the statute and consciously

repeating the rights-creating language, Congress may have intended to remove the enforceable right. Since *Blessing* and *Gonzaga*, Congress has been "on notice" of the language required to create an enforceable right. *See Goldring v. District of Columbia*, 416 F.3d 70, 76 (D.C. Cir. 2005)(finding that a statute did not allow shifting of expert fees because Congress did not use the "precise language" that the Supreme Court required). At the very least, the Court cannot conclude that Congress manifested an "unambiguous intent" to create an enforceable right. *Gonzaga*, 536 U.S. at 283.

Relying on the similarities in the implementing regulations before and after the 1998 Amendment, the plaintiffs also argue that the enforceable right continues to exist because the regulations "giv[e] rise to the duty owed by a PHA to tenants to refrain from demolition activity without first obtaining HUD approval." Pls.' Opp'n, ECF No. 16 at 42-43 (discussing 24 C.F.R. § 970.25). However, as explained, a regulation cannot create a right that Congress has not created in statutory text. *Sandoval*, 532 U.S. at 291 ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.").

In sum, the plaintiffs have failed to cite *any* statutory language in support of their claim. *See generally* Pls.' Opp'n, ECF No. 16. They have therefore not met their burden to

"demonstrate that [the] statute confers an individual right."
*Gonzaga*, 536 U.S. at 284. In independently reviewing Section
1437p, the Court has been unable to identify any language that
creates a federal right for plaintiffs to enforce a constructive
demolition claim. As discussed, public housing tenants are not
mentioned at all in the only sections that could conceivably be
relevant to a constructive discharge claim. *See* 42 U.S.C. §
1437p(a)(1)(A), (a)(3). Consequently, by amending the statute
and not including the post-*Edwards* clarifying language or any
other rights-creating language, the Court cannot conclude that
Congress manifested an "unambiguous intent" to create an
enforceable right. *Gonzaga*, 536 U.S. at 283. Because the Court
finds that Congress did not intend for these specific provisions
to benefit the plaintiffs, the Court does not need to consider
the remaining two *Blessing* factors.[16]

Because Section 1437p(a)(1)(A) and (a)(3) do not confer a
federal right to enforce a constructive discharge claim through
Section 1983, the plaintiffs have failed to state a claim
pursuant to Federal Rule of Civil Procedure 12(b)(6). Count III
is therefore **DISMISSED**.

---

[16] As the Court noted at the January 9, 2018 motions hearing, the
plaintiffs could have filed an action for housing code
violations in the Superior Court of the District of Columbia,
but chose not to avail themselves of that remedy. Mot. Hearing
Tr., ECF No. 25 at 95:11-97:3.

## C. The Court Declines to Exercise Supplemental Jurisdiction Over Count IV

In Count IV, the plaintiffs allege that DCHA discriminated against them based on their place of residence in violation of the DCHRA. *See* Compl., ECF No. 1 ¶¶ 157-167. The plaintiffs argue that DCHA has not been responding or has been responding more slowly to maintenance requests ever since Barry Farm was slated for redevelopment. *See id*. The DCHRA provides that it "shall be an unlawful discriminatory practice to [refuse or restrict facilities, services, repairs, or improvements for a tenant or lessee] wholly or partially for a discriminatory reason based on the actual or perceived . . . place of residence or business of any individual." D.C. Code § 2-1402.21(a),(a)(4).

Upon dismissal of Counts I, II, and III, the plaintiffs' complaint contains no remaining federal cause of action over which this Court has original subject matter jurisdiction.[17] *See* 28 U.S.C. § 1331. "Whether to retain jurisdiction over pendant ... claims after dismissal of the federal claims is a matter left to the sound discretion of the district court." *Ali Shafi v. Palestinian Auth.,* 642 F.3d 1088, 1097 (D.C. Cir. 2011) (quotations and citations omitted). The factors enumerated in 28 U.S.C. § 1367(c)—judicial economy, convenience, fairness, and

---

[17] Diversity jurisdiction is not available because the parties are all D.C. citizens. *See* 28 U.S.C. § 1332.

comity—guide the Court's discretion in determining whether to dismiss the state law claims. *Shekoyan v. Sibley Int'l,* 409 F.3d 414, 423 n.4 (D.C. Cir. 2005).

In this case, the factors weigh in favor of declining to exercise supplemental jurisdiction. Just as in *Fouch v. District of Columbia*, the Court has not invested significant time or resources on the state law claims, as compared to the significant time that it has devoted to the federal law claims. 10 F. Supp. 3d 45, 53 (D.D.C. 2014). Furthermore, because there are "few cases interpreting the place of residence provisions of the D.C. Human Rights Act," Pls.' Opp'n, ECF No. 16 at 36, considerations of comity and efficiency weigh in favor of allowing D.C. courts to interpret their local law. Accordingly, the Court declines to exercise supplemental jurisdiction.

## V. Conclusion

For the reasons set forth in this Memorandum Opinion, the defendants' motions to dismiss the plaintiffs' complaint are **GRANTED**. A separate Order accompanies this Opinion.

   **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
            **United States District Judge**
            **April 30, 2018**